**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAR 26 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

RONALD W. ROBERTS,

     Plaintiff - Appellant,

vs.

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY,

     Defendant - Appellee.

No. 02-7052
(D.C. No. 01-CV-499-S)
(E.D. Okla.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **ANDERSON**, and **MURPHY**, Circuit Judges.[**]

Plaintiff-Appellant Ronald W. Roberts appeals the district court's dismissal

of his action against State Farm Mutual Automobile Insurance Company ("State

Farm") pursuant to Fed. R. Civ. P. 56. Mr. Roberts filed the instant diversity

action in district court pursuant to 28 U.S.C. § 1332 alleging breach of his

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] After examining the briefs and the appellate record, this three-judge panel has determined unanimously that oral argument would not be of material assistance in the determination of this appeal. See Fed. R. App. P. 34(a); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument.

insurance contract and breach of the duty of good faith and fair dealing ("bad faith claim"). His complaint sought compensatory damages on both claims as well as punitive damages on the bad faith claim. The parties later resolved the breach of contract claim, leaving only the bad faith claim against State Farm. The district court thereafter granted State Farm's motion for partial summary judgment and dismissed the action in its entirety. On appeal Mr. Roberts argues that a genuine issue of material fact precluding summary judgment existed as to whether State Farm committed bad faith in investigating and evaluating his claim. Our jurisdiction arises under 28 U.S.C. § 1291, and we affirm.

Background

On September 11, 1998 Mr. Roberts was involved in an automobile accident with an underinsured motorist in Muskogee, Oklahoma. At the time of the accident Mr. Roberts had $75,000 available in underinsured motorist ("UM") coverage through State Farm, and the tortfeasor, who was solely at fault for the accident, had a liability policy carrying $25,000 in liability coverage. State Farm first became aware of a potential claim by Mr. Roberts on May 22, 2000 when his former attorney, Esther Sanders ("Ms. Sanders") sent a letter to State Farm seeking information relating to his insurance coverage. The next day a State Farm Claim Specialist provided the requested information to Ms. Sanders and

requested that she send State Farm any medical records relating to Mr. Roberts'

injuries. Enclosed in the letter were medical records authorizations to be

completed by Mr. Roberts enabling State Farm to obtain medical information

directly from his health care providers.

Ms. Sanders' next contact with State Farm did not occur until August of

2000 when she notified State Farm by telephone that she intended to file a state-

court action against the company to prevent expiration of the applicable statute of

limitations.[1] During this conversation Ms. Sanders notified State Farm that Mr.

Roberts had undergone arthroscopic surgery on his knee, at which point State

Farm renewed its request for medical records authorizations and medical

information. On October 11, 2000, nearly five months after State Farm's first

request for medical information, Ms. Sanders provided State Farm with a

summary of Mr. Roberts' medical expenses and lost wages together with medical

information she represented as constituting "all medical bills and medical records

related to treatment of injuries [Mr. Roberts] sustained in the wreck." Aplt. App.

at 82. The letter claimed that Mr. Roberts had incurred $16,286.27 in medical

expenses and $3,024.64 in lost wages. Finally, on October 30, 2000, State Farm

received an executed medical records authorization permitting it to access Mr.

---

[1] Although the suit was in fact filed, Ms. Sanders elected not to serve any
of the named parties in an attempt to facilitate a settlement. The case was later
dismissed without prejudice to being re-filed.

Roberts' medical records but disallowing all verbal communication with his physicians unless Ms. Sanders was present.

The medical records obtained by State Farm revealed that on the day of the accident Mr. Roberts went to the Muskogee Regional Medical Center complaining of a headache, pain in his neck, and soreness and pain in his back and abdomen. Three days after the accident Mr. Roberts visited his family physician, Dr. Chriss Roberts, complaining of pain in his abdomen, neck and right knee. Dr. Roberts prescribed pain medication and continued treating him as needed for the next 21 months until referring him to an orthopedist, Dr. R. Douglas Harper, on June 14, 2000. After diagnosing Mr. Roberts with "internal derangement" of the right knee, Aplt. App. at 90, Dr. Harper performed outpatient arthroscopic surgery on the knee on June 21, 2000. After a follow-up visit on June 29 Dr. Harper commented that Mr. Roberts was "doing well" and authorized him to return to light duty work as soon as July 5. Aplt. App. at 89. Dr. Harper thereafter saw Mr. Roberts on three more occasions, with the last visit occurring on August 14, 2000.[2]

Based on the foregoing information, Valina Enslen, a Claim Specialist at

---

[2] Despite State Farm's repeated requests for all pertinent medical records and Ms. Sanders' statement that the records enclosed in her October 11 letter constituted "all medical bills and medical records" related to his injuries, State Farm was never provided with any records of Mr. Roberts' three visits to Dr. Harper occurring after June 29, 2000.

State Farm ("Ms. Enslen"), prepared an Injury Evaluation Form for Mr. Roberts which listed his past medical expenses and wage loss as totaling $19,310.91, based on the amounts submitted by Ms. Sanders. Aplt. App. at 81. She further estimated Mr. Roberts' future medical expenses as ranging between $1,000 and $2,000, future wage loss between $100 and $1,000, and non-economic loss, including future pain and suffering, from $5,000 to $8,000. Id. Accordingly, Ms. Enslen's evaluation range for Mr. Roberts' claim was $25,410.91 to $30,310.91. Because the tortfeasor's carrier had already tendered its $25,000 liability policy limits, State Farm determined the evaluation range for State Farm's UM payment to Mr. Roberts to be between $410.91 to $5,310.91.

Pursuant to the above evaluation, and taking into account the $25,000 payment already made, State Farm offered Mr. Roberts $2,000 to settle his UM claim. Ms. Sanders responded with a $50,000 settlement demand, to which State Farm responded with a $4,000 counter-offer. After State Farm tendered a $2,000 payment representing the initial settlement offer, Ms. Sanders demanded that State Farm re-evaluate the claim, and threatened to re-file the previously dismissed state-court action in federal court if no settlement could be reached by a certain date. After discussing the claim with a State Farm attorney and a claims manager, State Farm authorized Ms. Enslen to offer $15,000 beyond the $25,000 tendered by the tortfeasor's carrier "if it would settle the case." Aplt. App. at 12.

After rejecting this latest offer Mr. Roberts filed the instant action in district court on August 31, 2001 alleging that State Farm committed bad faith by failing to properly investigate, evaluate and pay his claim. Applying Oklahoma law, the district court granted State Farm's motion for partial summary judgment, holding that: 1) State Farm's investigation was reasonable under the circumstances, and 2) State Farm negotiated and handled Mr. Roberts' claim in good faith. This appeal followed.

<u>Discussion</u>

We review a grant of summary judgment de novo and apply the same standard applied by the district court. <u>Ashley Creek Phosphate Co. v. Chevron USA, Inc.</u>, 315 F.3d 1245, 1253 (10th Cir. 2003). Summary judgment is proper where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). Moreover, a dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986). On appeal Mr. Roberts alleges that the district court erred in granting partial summary judgment because 1) reasonable jurors could have concluded that State Farm failed to discharge its duty of good faith by failing to conduct an adequate investigation into the value of his claim, and 2) no good faith

dispute existed as to the value of his claim, and that he therefore presented sufficient evidence to survive a motion for summary judgment.

Under Oklahoma law, an insurer can be held liable for bad faith "only where there is a clear showing that the insurer unreasonably, and in bad faith, withholds payment of the claim of its insured." Christian v. American Home Assur. Co., 577 P.2d 899, 905 (Okla. 1977). Moreover, the Supreme Court of Oklahoma has held that "bad faith cannot exist if an insurer's conduct was reasonable under the circumstances." Barnes v. Okla. Farm Bureau Mut. Ins. Co., 11 P.3d 162, 170-171 (Okla. 2000). This duty to act reasonably extends to the manner in which an insurer investigates an insured's claim. Buzzard v. Farmers Ins. Co., Inc., 824 P.2d 1105, 1109 (Okla. 1991) (holding that an insurer has a duty to "conduct an investigation reasonably appropriate under the circumstances."). For the following reasons we hold that summary judgment was proper because no reasonable jury could have concluded that State Farm's investigation and evaluation of his claim was unreasonable.

As to his inadequate investigation claim, we note first that Mr. Roberts does not contend that State Farm conducted no investigation or that the company has "intentionally disregarded undisputed facts supporting the insured's claim." Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1442 (10th Cir. 1993). Likewise, Mr. Roberts does not dispute that State Farm repeatedly requested all

relevant medical records, and he admits that none of the records provided by himself, his attorney, or his doctors in any way indicated a possibility of permanent impairment, osteoarthritis, or future medical care. Aplt. Br. at 11. Rather, Mr. Roberts argues that although State Farm promptly requested his records and based its evaluation on the information contained therein, which Ms. Sanders represented to be complete, State Farm's investigation was nonetheless inadequate because it failed to seek additional information relating to his damages. Specifically, Mr. Roberts argues that State Farm should have sought additional information such as a narrative report from Dr. Harper or arranged to meet with him to discuss the extent of his injuries, and that the failure to do so amounted to bad faith. We disagree.

Although State Farm's investigation may have resulted in an undervaluation of Mr. Roberts' claim, it was not because State Farm's investigation was "unreasonable under the circumstances." State Farm began investigating the claim almost as soon as it learned of a potential claim by Mr. Roberts. In fact, State Farm requested medical records and medical records authorizations the day after receiving the initial notice. In that letter State Farm specifically requested Ms. Sanders to "forward any medical information on your clients . . . which would help in evaluating their claims." Aplt. App. at 84. When, almost three months later, Ms. Sanders called to inform State Farm that Mr. Roberts had

undergone surgery and to inform the company of her intention to file a state-court action, State Farm renewed its request for medical records and information. When Ms. Sanders finally provided this information, State Farm did not end its investigation into the value of Mr. Roberts' claim even though Ms. Sanders represented that the records and bills she submitted were complete. Aplt. App. at 82, 235-36. As soon as State Farm received the medical records authorization from Mr. Roberts, State Farm promptly sent it, along with a request for "all of the clinical records for [Mr. Roberts] regardless of when they were created" to Dr. Harper, Dr. Roberts, the hospital where he was initially treated, and the hospital where his outpatient surgery was performed. Aplt. App. at 87, 88, 91, 95. Upon receipt of the records, State Farm had no reason to believe that the records and statements it had obtained from Mr. Roberts' attorney and health care providers were anything other than complete.

Moreover, we do not agree with Mr. Roberts that State Farm *knew* that his knee was at risk for osteoarthritis and that it would never be as good as before the injury. Mr. Roberts argues that notwithstanding the medical records' silence on this question, because State Farm in fact knew that his knee would never be the same, it should have investigated further the possible extent of such future harm. However, none of the portions of the record cited by Mr. Roberts support his claim that State Farm personnel "knew" Mr. Roberts would suffer future

complications, and we believe several demonstrate exactly the opposite. See, e.g. Aplt. App. at 139. Moreover, even if State Farm did know that Mr. Roberts' knee would never completely heal, because its evaluation took into account future pain and suffering, as well as future wage loss and medical expenses, see Aplt. App. at 81, 140, it cannot be said that State Farm wholly disregarded such information.

Of course, State Farm could have scheduled interviews with his doctors, sought narrative reports, or followed up with his health care providers to ensure that no relevant information was for whatever reason omitted from the records. Under Oklahoma law, however, an insurer's investigation need only be reasonable, not perfect. Buzzard, 824 P.2d at 1109. In light of the fact that State Farm requested all relevant information from Mr. Roberts' attorney and his doctors, and the fact that nothing in those records suggested they were incomplete or erroneously omitted discussion of possible future knee problems, we agree with the district court that no reasonable jury could have concluded that State Farm's investigation was unreasonable under the circumstances.

We reach a similar conclusion in regard to Mr. Roberts' argument that State Farm's evaluation of his claim and the settlement offers that followed were unreasonable, and that the district court therefore erred in granting summary judgment. In interpreting Oklahoma law in this area, this court has held that "the insurer does not breach [the duty of good faith] by refusing to pay a claim or by

litigating a dispute with its insured if there is a 'legitimate dispute' as to coverage or amount of the claim, and the insurer's position is 'reasonable and legitimate.'" Thompson v. Shelter Mut. Ins. Co., 875 F.2d 1460, 1462 (10th Cir. 1989) (quoting Manis v. Hartford Fire Ins. Co., 681 P.2d 760, 762 (Okla. 1984)). After carefully reviewing the parties' briefs, the record, and relevant Oklahoma authorities, we believe that no reasonable jury could have concluded that State Farm's evaluation and settlement offers constituted bad faith under this standard.

First, we note that State Farm's initial settlement offer was within the range it assigned to Mr. Roberts' claim. Thus, we are not presented with the situation where an insurer has offered to settle a dispute in an amount below the range assigned to the claim by the insurer's own investigation. See Newport v. USAA, 11 P.3d 190,196-197 (Okla. 2000) (holding that after a reasonable investigation, an insurer must promptly settle a claim "for the value or within the range assigned to the claim as a result of its investigation."). Moreover, because we have determined that State Farm's investigation was reasonable, we reject any contention that State Farm's settlement offers or its initial evaluation were unreasonable by virtue of an inadequate investigation.

Furthermore, as Mr. Roberts concedes, nothing obtained during the course of State Farm's investigation in any way suggested or implied that he would likely require future medical care or suffer permanent impairment or other problems

stemming from the knee injury. Aplt. Br. at 11. Even so, State Farm nonetheless figured future non-economic losses, such as pain and suffering, and future medical expenses and lost wages into its calculation of the amount of damages likely to be incurred as a result of the accident.[3] As noted above, State Farm estimated Mr. Roberts' future medical expenses as ranging between $1,000 and $2,000, future wage loss between $100 and $1,000, and non-economic loss from $5,000 to $8,000. Although Mr. Roberts takes issue with these amounts, it cannot be said, as he repeatedly suggests, that State Farm simply chose to "assume no impairment, to assume no further treatment, and to assume no osteoarthritis," Aplt. Br. at 10, when State Farm in fact assumed just the opposite.

It is true that Mr. Roberts may suffer future economic and non-economic losses exceeding the amounts listed by State Farm. However, in light of the information obtained by State Farm through its investigation, Mr. Roberts' failure to inform State Farm of any additional information within his possession that would have assisted State Farm in evaluating his claim, and the complete lack of evidence suggesting that State Farm knew Mr. Roberts' injury to be worth more

---

[3] As an additional example of State Farm's willingness to treat Mr. Roberts with fairness, we note that following receipt of Ms. Sanders' summary of Mr. Roberts' medical expenses, State Farm calculated the amount to be $14,454.27 instead of $16,286.27 as calculated by Ms. Sanders. Aplt. App. at 113. Nonetheless, State Farm employed the higher figure in determining the amount of UM benefits to which Mr. Roberts was likely entitled. Id.

than the range assigned to it, we hold that no reasonable jury could have concluded that State Farm's conduct in this respect was unreasonable.

Furthermore, our conclusion is not affected by the deposition testimony of various experts, including Dr. Harper, that future damages for Mr. Roberts' injuries will likely exceed the amounts estimated by State Farm. Significantly, this evidence arose only after Mr. Roberts initiated his action in federal court. We agree that such evidence would be relevant to establishing an entitlement to damages in excess of that offered by an insurer, or to establishing a bad faith claim where the insurer was in possession of similar information during its investigation. We fail to see, however, how such testimony is relevant to the question of whether State Farm engaged in bad faith here. As Mr. Roberts concedes, the medical information State Farm obtained gave absolutely no indication that Mr. Roberts was at risk of developing any of the problems his experts now claim are likely to occur. It was on the basis of the information in these records, not the information supplied after settlement negotiations had ended, that State Farm evaluated and attempted to settle Mr. Roberts' claim. Under such circumstances we cannot hold that the district court erred in granting State Farm's motion for partial summary judgment.

AFFIRMED.

Entered for the Court


Paul J. Kelly, Jr.
Circuit Judge