**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**September 5, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JAMES BANNISTER,

      Plaintiff-Appellant/Cross-Appellee,

v.

STATE FARM MUTUAL
AUTOMOBILE INSURANCE
COMPANY,

      Defendant-Appellee/Cross-Appellant.

Nos. 11-6174 and 11-6186

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:09-CV-01244-F)**

Jacob L. Rowe, Oklahoma City, Oklahoma (Jim Buxton of Buxton Law Group, Oklahoma City, Oklahoma, and Billy Coyle, Oklahoma City, Oklahoma, with him on the briefs), for Plaintiff-Appellant/Cross-Appellee.

Reid E. Robison of McAfee & Taft, P.C., Oklahoma City, Oklahoma (Mark D. Spencer, Michael K. Avery, McAfee & Taft, P.C., Oklahoma City, Oklahoma, and Daniel C. Andrews, Oklahoma City, Oklahoma, Jones, Andrews & Oritz, P.C., Of Counsel, with him on the briefs) for Defendant-Appellee/Cross-Appellant.

Before **TYMKOVICH, EBEL,** and **HOLMES,** Circuit Judges.

**EBEL**, Circuit Judge.

Plaintiff James Bannister was injured in a motorcycle accident on the freeway near Oklahoma City in 2009. According to Bannister, he was forced to lay down and slide his motorcycle at a high speed when a car in front of him braked suddenly, that car having been cut off by another car. Bannister slammed into the wall of the freeway and suffered substantial injuries. He did not collide with any other vehicle; neither of the aforementioned cars remained at the scene of the accident; and no witnesses besides Bannister ever gave an account of the crash.

Bannister filed an insurance claim with his insurer, defendant State Farm Automobile Insurance Company ("State Farm"). State Farm denied Bannister's claim, finding him to be majority at fault in the accident, which precluded recovery under his insurance policy. Bannister subsequently filed suit in Oklahoma state court, and State Farm removed the case to the Western District of Oklahoma. By the time the case went to trial, Bannister sought relief solely on a tort theory: that State Farm violated its duty of good faith and fair dealing in denying his claim.

The jury found in favor of Bannister, but the district court granted State Farm's renewed motion for judgment as a matter of law ("JMOL"), ruling essentially that the evidence showed that State Farm's denial of Bannister's claim was based on a reasonable dispute regarding whether Bannister was majority at fault, and that no evidence suggested that further investigation would have undermined the reasonableness of that dispute. Meanwhile, the district court conditionally denied State Farm's alternative motion for a

new trial based on the jury's irregular calculation of damages as well as on allegedly improper prejudicial statements by Bannister's counsel at trial.

Exercising jurisdiction under 28 U.S.C. § 1291 over this diversity action, we AFFIRM the district court's JMOL ruling in favor of State Farm. Accordingly, we DISMISS AS MOOT State Farm's cross-appeal, regarding whether the district court abused its discretion in conditionally denying State Farm's alternative motion for a new trial.

## I. BACKGROUND

*1. The motorcycle accident*

On Thursday afternoon, January 22, 2009, Bannister was driving his motorcycle in the left-hand lane on Interstate 40, en route to pick up his wife at work. According to his own testimony at trial, Bannister was driving at a speed of approximately 65-70 mph, or 5-10 mph above the legal limit. Bannister had been drinking beforehand at a motorcycle bar in Oklahoma City, where he had two beers and a shot of whisky over the course of perhaps two and a half hours. The police report for the accident indicated that Bannister was driving under the influence of alcohol.[1]

---

[1] The actual notation on the police report was "ALCOHOL-DUI/DWI." We note that State Farm, which had obtained the police report prior to denying Bannister's claim, used "DUI" in its claim logs. Also, Bannister testified that he had been criminally charged with "driving under the influence"—a charge that was later dismissed for reasons not disclosed in the record. Bannister's hospital record, which does not appear to have been introduced at trial, reveals that when Bannister was admitted to the hospital, his blood-alcohol level was 0.09.

3

At trial, Bannister claimed that, just prior to his accident, he was following a beige car at a safe distance when a red car, apparently in the right lane, came alongside him and began to encroach into his lane.[2] Bannister revved his engine so as to send an auditory warning to the driver of the red car (in effect, a honk). The red car stayed in its lane, passed the beige car, and then cut off the beige car, causing it to brake suddenly. The beige car slid into the emergency lane, and Bannister locked his brakes.

Bannister's recollection of the crash is foggy. He testified that, to avoid hitting the vehicle in front of him,[3] he executed a 'lay down' of his motorcycle—essentially a deliberate (though necessarily somewhat uncontrolled) fall-and-slide. The maneuver sent Bannister into the freeway's barrier wall at a high speed. Bannister hit his head against the wall and suffered head trauma, broken bones, bruising, lacerations, and other injuries that kept him in the hospital for eight days. Neither the red car nor the beige car remained at the scene of the accident; an unidentified other vehicle stopped to assist Bannister.

2. *The insurance claim*

---

[2] No other witnesses from the scene of the accident were ever interviewed. As noted below, at one point during a discussion with a State Farm representative, Bannister referenced a witness from a car behind him who he said stopped and helped him. However, Bannister did not provide any identifying information about that individual, and neither the police report nor any other account identified the individual.

[3] Presumably Bannister was referring to the beige car. Bannister meanwhile said that the beige car had moved into the emergency lane, but perhaps Bannister had also steered into the emergency lane.

The day after the crash, January 23, 2009, Bannister's wife reported the accident to State Farm. State Farm's first relevant substantive log entry in Bannister's claim file (entry No. 7) was recorded by State Farm claim representative Wendy Jeffus based on Jeffus's conversation with Bannister's wife. That log entry characterized the crash as having involved a vehicle in front of Bannister slamming on its brakes, and Bannister swerving to avoid that vehicle, and rolling[4] his motorcycle. The log further noted that investigation was needed to determine whether Bannister's uninsured motorist ("UM") coverage—coverage that could apply to unknown "miss-and-run" vehicles—would apply, as well as whether Bannister was majority at fault, which would negate coverage. The log indicated that Jeffus explained as much to Bannister's wife.

Three days later, on January 26, 2009, another claim representative, Edwina Kelley-Gilliam of the UM division of State Farm, updated Bannister's claim log after speaking with a team manager named Collins, who worked in the auto claims, or liability,

---

[4] Bannister has emphasized that he did not "roll" his motorcycle but rather "laid [it] down"—lay-down being a more controlled, deliberate (and so presumably less negligent) maneuver. E.g., ROA v. III at 835; Aplt. Br. at 7. At trial, Jeffus acknowledged that rolled would tend to indicate a flipping of the motorcycle, rather than a sliding. ROA v. II at 531. Jeffus testified that Bannister's wife did in fact use the term "rolled" in describing the accident, id., although Bannister's wife testified that she did not recall using that term and that she probably said "laid the motorcycle over" instead, id. at 481. In any event, the manner in which the motorcycle fell does not appear to have made a material difference to State Farm's evaluation of Bannister's comparative negligence in the accident or to its investigation of Bannister's claim. Rather, State Farm's claim denial focused on other facts, primarily the single-vehicle nature of the accident and that the vehicle in front of Bannister was able to avoid a collision with the vehicle in front.

division.[5]  Kelley-Gilliam's log entry (entry no. 14) reflected: "[T]he liability [investigation] does not appear complete.  In addition, the insured appears to be majority at fault based on the facts of the loss.  Moving file back to [the auto claims division] pursuant to our discussion.  UM retains nothing . . . ."  ROA v. V at 1500.  It apparently took Kelley-Gilliam three minutes to enter that determination.

The next significant event occurred on February 9, 2009, when another State Farm claim representative, Gloria Mercado of the motorcycle collision division, met with Bannister.  Mercado's purposes were to examine the crashed motorcycle and to complete a vehicle inspection report concerning the damage incurred by the motorcycle.  In other words, Mercado's primary mission was to evaluate damages to the motorcycle as relevant to Bannister's collision coverage, rather than to investigate Bannister's liability.  However, in addition to evaluating the motorcycle, Mercado discussed the accident with Bannister over the course of their meeting.  And at trial, Bannister testified that the account of the accident that he related to Mercado was a truthful one.  Mercado did not electronically record the conversation, but she summarized it in a claim log (entry no. 37).  As reflected in that log, Bannister told Mercado that

> 2 other cars flew by him on the right and switched over in front of the car directly ahead of him.  Then the car in front of him had to hit brake [sic]

---

[5] Different divisions within State Farm serve different functions.  For instance, the UM division determines whether a claim will be a UM claim versus whether another motorist does have insurance that will cover an incident; the vehicle collision division seems chiefly to evaluate damages to vehicles; and the auto claims (liability) division investigates the level of fault of claimants such as Bannister.

and [Bannister] wasn't able to get slowed fast enough so he laid [his motorcycle] over to keep from hitting car in front of him, he has over 30 years['] experience riding [a motorcycle] & this was his 1st wreck. He's unsure why cars slammed on brakes as none of them stopped for him. A car behind him saw what happened and stopped his car sideways to keep any other traffic from running over [him]. . . .

Id. at 1495. This log entry was largely consistent, then, with the earlier-made entry no. 7.[6] Meanwhile, this new entry added the information about Bannister's riding experience as well as the reference to the other car, behind Bannister, whose driver allegedly witnessed the accident. However, Bannister never gave Mercado or anyone else any identifying information about that alleged individual.

At trial, Mercado testified that she believed that based on these facts, Bannister would be at fault. She reasoned that due to the fact that the car in front of Bannister was able to stop without collision, Bannister—driving behind that car—likewise should have been able to stop safely, if Bannister had been following at a reasonable distance per his duty as a motorist.

On February 17, 2009, State Farm obtained a copy of the police report for Bannister's accident. The next substantive entries in the claim log were a pair of entries (entries nos. 73-74) by Patrick Dreier of State Farm's auto claims division on February 25. Dreier's entries essentially summed up State Farm's knowledge to date—the history

---

[6] The only inconsistency is log entry no. 37's reference to "2 cars" passing the vehicle in front of Bannister, whereas according to log entry no. 7 (as well as Bannister's trial testimony), only one car (the red car) cut off the car in front of him (the beige car). That discrepancy is immaterial, however.

7

of State Farm's investigation, one might say. The entries indicated that the accident was a single-vehicle wreck, that Bannister had been driving under the influence of alcohol, and that no second vehicle was involved in any collision. Further, they concluded that Bannister was 100 percent at fault and that, accordingly, he was not entitled to UM coverage, to which an insured is not entitled if the insured is more than fifty percent at fault. The entries did not specify which prior logs/information their conclusions were based on, or to what extent. At trial, Bannister's attorney emphasized that, judging from the claim log, Dreier appeared to take eleven minutes to reach these conclusions. Also, the February 25 date of these entries is the date that Bannister's attorney stressed at trial as the cutoff date of when State Farm stopped "investigating" Bannister's claim and "denied" coverage. See, e.g., ROA v. III-IV at 700, 752, 755, 806, 827, 943, 952.[7]

On March 17, 2009, State Farm communicated to Bannister that his UM claim would be denied, though the exact context of this communication is unclear. Bannister testified he did "recall calling [State Farm after his doctor told him that he had not received payment for Bannister's treatment] and speaking to somebody [who said] that State Farm wasn't liable to pay." ROA v. III at 878.

On April 23, 2009, Bannister's attorney wrote to State Farm formally to request a

---

[7] Dreier, who entered the February 25 logs, did not testify at trial. Dreier had been transferred to a Missouri division of State Farm by then, and Bannister did not depose him. Thus, it was then-liability-agent Eddie Walker (who subsequently left State Farm but who nonetheless testified at trial) who testified in regard to the import of Dreier's entry.

8

written explanation for the basis of State Farm's denial of Bannister's claim. On April 30, presumably in reaction to that request, State Farm asked one of its liability agents, Eddie Walker, to review Bannister's case. Walker, based on his review of the claim logs, recorded (in entries nos. 83-84) that the investigation of Bannister's case was finished, and that

> all evidence would indicate [Bannister] himself was responsible for this collision and no one [sic] else. No support on [police report] or even in [Bannister's] own statement that would indicate someone, other than himself, is liable for this accident. . . . UM [coverage] would not apply as [Bannister] was the proximate cause of this accident. . . . [Police report] also notes that there was drinking involved . . . . When we obtained facts from [Bannister], he stated he left roadway as vehicle in front of him slammed brakes and he swerved to avoid hitting the rear of this vehicle and rolled motorcycle. . . .

ROA v. V at 1488.

On June 9, 2009, State Farm UM claim representative Dani Conover sent a letter to Bannister's attorney stating the following:

> At this time, we have no evidence Mr. Bannister is legally entitled to collect from an uninsured motorist. The police report we have indicates [Bannister's] vehicle left the roadway for an unknown reason, and notes an improper start from alcohol-DUI/DWI. If you are aware of any information that does support [that Bannister] is legally entitled to collect [on his UM policy], please let me know, and we will be happy to review it.

Id. at 1526.

State Farm apparently did not receive a response to that letter, so on July 7, 2009—after Bannister had filed his complaint in this lawsuit—Conover sent another letter to Bannister's attorney to the same effect.

9

*3. The lawsuit and the trial*

Bannister filed his complaint in Oklahoma state court on June 24, 2009. He alleged both that State Farm had breached its insurance contract with respect to Bannister's UM policy, and that State Farm had breached its duty of good faith and fair dealing in denying Bannister's UM claim. State Farm removed the case to the Western District of Oklahoma in November 2009. In September 2010, State Farm moved for summary judgment on both of Bannister's claims, but the district court denied the motion. However, before trial, Bannister dropped his breach of contract claim. Bannister's bad faith claim was thus the only claim presented at trial.[8]

---

[8] Bannister acknowledges that he initially "proceed[ed] with both his breach of contract and his bad faith causes of action," but "chose to proceed to trial only on the bad faith cause of action." Aplt. Br. at 5. This tactical decision was reflected as early as the December 2010 Final Pretrial Report (Dist. Ct. docket, Doc. 49), which superceded all previous pleadings. It is later reflected in the "Statement of the Case" jury instruction. ROA v. II at 400.

We reject Bannister's argument on appeal that even if he is not entitled to recover on his bad-faith claim, he should still recover damages on a breach-of-contract theory in the amount allegedly owed under his insurance policy ($125,000). Bannister reasons that the jury, in finding State Farm liable on the tort of bad faith, necessarily found in his favor on the contract issue. See infra Section II-A-2 (noting that the first element of a bad-faith claim is that the insurer was required to pay under the insurance policy). Bannister's assertion that he "did not need to try his breach of contract cause of action because the bad faith cause of action, which he did try, included the contract claim," Aplt. Br. at 32-33, is half-correct and half-incorrect. Breach of contract was indeed one element the jury needed to find in determining that State Farm was liable for the tort of bad faith; and breach of contract can be a standalone theory of recovery. However, it does not follow that Bannister may therefore recover based on the jury's finding of a single element of Bannister's sole asserted claim—the tort of bad faith—when Bannister chose to abandon his earlier-asserted contract claim.

Continued . . .

10

A three-day trial occurred at the end of March 2011. Bannister's attorney called seven witnesses to testify: Bannister's wife, four State Farm claims representatives from various departments who in some way dealt with Bannister's claim, a corporate representative from State Farm, and Bannister himself. State Farm cross-examined each witness but did not call any witnesses of its own. At that point, State Farm moved for

_____

Cont.

In arguing for a contrary conclusion, Bannister invokes the concept of lesser-included offenses from the criminal law context. However, we are unaware of any precedent extending that criminal doctrine to this civil context, such that a forsaken contract claim would be transformed into an independent sub-claim of a separate tort claim, upon which recovery could be independently awarded. We do not interpret the Court of Civil Appeals of Oklahoma's decision in Cales v. Le Mars Mut. Ins. Co., 69 P.3d 1206 (Okla. Civ. App. 2002), to compel a contrary conclusion. Cales held that a new trial was warranted in light of the trial court's improper decision to bifurcate the plaintiff's breach of contract and bad faith claims into separate trials. Id. at 1208-09. In doing so, the appellate court reflected:

> We further note the trial court incorrectly describes Cales' suit as "two causes of action." Cales has but one cause of action: for damages arising out of Insurer's failure to pay Cales' claim. In support of that cause of action Cales has two interrelated theories of recovery. The first, sounding in contract, is for damages arising out of Insurer's failure to pay the claim in breach of the insurance contract. The second theory of recovery sounds in tort, based on Cales' allegation that Insurer acted in bad faith by ignoring relevant information in its investigation of the claim, leading to its decision not to pay. These theories are connected and, as set out below, should not be bifurcated.

Id. at 1208. However, notwithstanding Cales's "not[ing]" that the plaintiff's breach of contract claim and bad faith claims comprised "one cause of action," the actual holding of Cales was that it was improper to bifurcate the consideration of the "two interrelated theories of recovery" when both theories had been asserted. Id. Cales did not hold that a plaintiff could recover under the 'lesser-included' theory of breach of contract when he had earlier chosen to abandon that theory.

11

JMOL under Fed. R. Civ. P. 50(a), arguing that the evidence presented at trial did not provide a sufficient factual basis upon which the jury could find in favor of Bannister. The court took the motion under advisement and allowed the case to proceed. Jury instructions and closing arguments followed.

The jury returned an award of $125,000 in compensatory damages for Bannister. Additionally, the jury also found that State Farm had acted recklessly. That finding of recklessness triggered consideration of punitive damages, in line with Oklahoma's system of bifurcated consideration of compensatory and punitive damages.[9] The jury

---

[9] Oklahoma law sets forth a bifurcated procedure that the jury must follow in considering actual and punitive damages, when the jury finds that an insurer recklessly disregarded its duty of good faith in denying a claim. Under such circumstances,

> the jury, in a separate proceeding after the jury has made such a finding [regarding recklessness] and awarded actual damages, may award punitive damages in an amount not to exceed the greater of [$100,000 or the amount of actual damages awarded]. Any award of punitive damages under this subsection awarded in any manner other than as required in this subsection shall be void and reversible error.

Okla. Stat. Ann. tit. 23, § 9.1(B)(2); see Lierly v. Tidewater Petroleum Corp., 139 P.3d 897, 906 (Okla. 2006).

In this case, the jury was informed, prior to its initial calculation of compensatory damages:

> following the reading of your verdict in open court, there will be a brief additional hearing in which the parties will have the opportunity to present evidence and arguments with respect to punitive damages. At the conclusion of that additional hearing, you would return to the jury room to determine whether to award punitive damages and, if so, in what amount.

ROA v. II at 413-14 (Jury Instruction no. 13).

therefore then heard brief testimony relevant to punitive damages. The jury was subsequently instructed on punitive damages, with the court explaining the bases on which they could award punitive damages and advising the jury that "[i]n no event should the punitive damages exceed the amount of actual damages ($125,000) you have previously awarded." ROA v. II at 421 (Supplemental Jury Instruction no. 1). Counsel for the parties then made closing arguments with respect to the issue of punitive damages.

Afterwards, the jury withdrew to deliberate on punitive damages, and then sent the following note to the court:

> We the jury were not clear on the dollar amount awarded in actual damages on this claim. We thought we could only award the cap amount we kept hearing about, which was $125,000. Nor did we know that it would cap the amount of our punitive damages.

Id. at 428. It is unclear what prompted the jury to realize that it could have awarded more than $125,000 in compensatory damages; the jury had not expressed confusion with that instruction during the first stage of deliberations.

The court discussed the note with the parties and heard their input about how to proceed. Bannister advocated allowing the jury to recalculate compensatory damages, then letting the jury proceed with calculating punitive damages, reflecting that it would be wasteful to order a new trial. In contrast, State Farm's urged the court to declare a mistrial, arguing that allowing the jury to recalculate compensatory damages with the knowledge that its compensatory award would cap its potential punitive award would circumvent the statutory purpose behind bifurcation of the respective considerations. The

13

court denied State Farm's motion and allowed the jury to re-deliberate on compensatory damages and then calculate punitive damages afterwards. The jury ultimately returned a verdict awarding $350,000 in compensatory damages and $350,000 in punitive damages.

On April 27, 2011, State Farm renewed its motion for JMOL pursuant to Fed. R. Civ. P. 50(b), and moved in the alternative for a new trial pursuant to Fed. R. Civ. P. 59. State Farm argued that procedural irregularity in the jury's consideration of damages, as well as allegedly improper references made by Bannister's counsel through trial, warranted a new trial. After the motions were briefed and a hearing was held, the court granted State Farm's renewed motion for JMOL, concluding that Bannister's bad faith claim could not properly be submitted to the jury as a matter of law. The court determined that the evidence showed that State Farm denied Bannister's claim based on facts that reasonably supported a legitimate dispute as to whether Bannister was majority at fault in his accident; and that no evidence suggested that further investigation would have undermined the State Farm's legitimate basis for disputing the claim.

Meanwhile, with respect to State Farm's alternative motion for a new trial, pursuant to Fed. R. Civ. P. 59(c) the court conditionally denied that motion in the event that the court's JMOL decision were reversed. The court concluded that the complained-of matters—including the peculiar sequence of events in the jury's calculation of damages, and allegedly improper statements by Bannister's counsel at trial—did not warrant a new trial. The court further noted that many of counsel's statements had not been objected to during trial.

14

Finally, the court denied Bannister's motion for attorney fees. The Court observed that Bannister was not a prevailing party and determined that, even if he were, State Farm's defense in the lawsuit was neither asserted in bad faith, ungrounded in fact, nor unwarranted by existing law, as required by statute for recovery of attorney's fees in this case.

Bannister appealed the district court's grant of JMOL to State Farm, as well as the court's denial of Bannister's motion for attorney's fees. State Farm cross-appealed the court's conditional denial of its alternative motion for a new trial.

## II. DISCUSSION

### A. Legal Standards

*1. Appellate review of JMOL generally*

We review de novo the district court's grant of State Farm's renewed motion for JMOL, applying the same standard as the district court. See Bristol v. Bd. Of Cnty. Comm'rs of Cnty. of Clear Creek, 312 F.3d 1213, 1216 (10th Cir. 2002) (en banc). Accordingly, we will affirm the district court if we determine that "a reasonable jury would not have [had] a legally sufficient evidentiary basis to find for" Bannister on his bad faith claim. Fed. R. Civ. P. 50(a)(1); see also Bristol, 312 F.3d at 1216. In making that determination, we "construe the evidence and inferences most favorably to the nonmoving party, and refrain from weighing the evidence, passing on the credibility of witnesses, or substituting our judgment for that of the jury." Magnum Foods, Inc. v. Cont'l Cas. Co., 36 F.3d 1491, 1503 (10th Cir. 1994) (citation omitted). Further,

"[a]lthough federal law dictates [the procedural question of] whether a judgment as a matter of law is appropriate, . . . in a diversity case we examine the evidence in terms of the underlying burden of proof as dictated by state law." Id. (citations omitted).

*2. The tort of bad faith*

The law of bad faith was properly encapsulated by Jury Instruction no. 10 in this case. The instruction on the elements of Bannister's bad faith claim (i.e., breach of the duty good faith and fair dealing) was that "[Bannister] must prove each of the following elements by the greater weight of the evidence":

> FIRST: That State Farm was required under the insurance policies to pay Mr. Bannister's uninsured motorist claim[10];
>
> SECOND: That State Farm's refusal to pay the claim was unreasonable under the circumstances because
>
> 1) State Farm did not perform a proper investigation,
> 2) State Farm did not evaluate the results of the investigation properly, or
> 3) State Farm had no reasonable basis for the refusal.
>
> THIRD: That State Farm did not deal fairly and in good faith with Mr. Bannister; and
>
> FOURTH: That the violation by State Farm of its duty of good faith and fair dealing was the direct cause of the damages sustained by Mr. Bannister and sought to be recovered in this action.

ROA v. II at 408 (emphases added, footnote added). The instruction went on to state:

---

[10] State Farm argues that it is deserves JMOL on the independent basis of this first element, asserting that "undisputed evidence demonstrates that Bannister was majority at fault." Aple. R. Br. at 1. Because of our other rulings in this appeal, we need not address that argument.

16

In determining whether the insurer had a good faith belief in some justifiable reason for denying payment at the time it made its decision on the insurance claim, you [the jury] may only consider evidence which the insurer had at the time it decided to deny the claim. In this action there is a factual dispute about when that decision was made.

An insurer's refusal to pay a claim is not bad faith when there is a legitimate dispute concerning coverage; however, merely because there is a reasonable basis that an insurance company could invoke to deny a claim does not necessarily immunize the insurer from a bad faith claim if, in fact, it did not actually rely on that asserted reasonable basis and instead took action in bad faith. The insurer is not required to show that its good faith belief was correct.

Id. at 409 (emphasis added).

That instruction properly stated the elements of the tort of bad faith. See Badillo v. Mid Century Ins. Co., 121 P.3d 1080, 1093 (Okla. 2005) (citing Oklahoma Uniform Jury Instructions Civ (2d) 22.3). The district court properly recognized that it was not bad faith per se for State Farm to resort to the judicial forum to settle legitimate disputes over insurance claims. See Garnett v. Gov't Employees Ins. Co., 186 P.3d 935, 944 (Okla. 2008). The court correctly acknowledged that the decisive questions are whether State Farm's denial of coverage was based on a good-faith reason at the time it decided to deny coverage, and also whether State Farm conducted an investigation reasonably appropriate under the circumstances to determine the validity of Bannister's claim. See Buzzard v. Farmers Ins. Co., Inc., 824 P.2d 1105, 1109 (Okla. 1991).

*3. Appellate review of JMOL in bad faith cases specifically*

"[A]s a matter of law . . . no reasonable inference of bad faith arises"—and hence JMOL is warranted for the insurer—"when an insurer denies a claim solely because of

17

the existence of a legitimate dispute." Oulds v. Principal Mut. Life Ins. Co., 6 F.3d 1431, 1442 (10th Cir. 1993). However, "a legitimate dispute as to coverage will not act as an impenetrable shield against a valid claim of bad faith." Timberlake Constr. Co. v. U.S. Fidelity & Guar. Co., 71 F.3d 335, 343 (10th Cir. 1995). Thus, in "cases in which the question of bad faith [is] required to be submitted to the jury, the evidence of the insurer's defense to the underlying claim [is] so weak that a reasonable inference could be drawn that the insurer denied the claim in bad faith." Oulds, 6 F.3d at 1442; see also Timberlake, 71 F.3d at 343 ("In sum, 'in order to establish such a [bad faith] claim, the insured must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief' [for denying the claim]." (quoting Oulds, 6 F.3d at 1436) (alteration marks omitted)). In other words, if the evidence at trial demonstrates that "there was a legitimate dispute as to coverage under the policy, and that [the insurer's] position was reasonable in light of the facts known or knowable to it at the time it denied [the] claim," then "as a matter of law [the insurer] did not breach the duty of good faith merely by refusing to pay [the] claim." Timberlake, 71 F.3d at 344. Rather, the claimant must "produce additional evidence of bad faith in order to send the issue to the jury." Id.

To that end, a jury may decide the issue of bad faith, even when the evidence reveals a legitimate possible basis for a dispute, if the claimant submitted evidence that the insurer did not actually rely on that legitimate basis but rather denied the claim for an illegitimate reason, such as a "systematic, bad faith scheme of canceling policies without

18

. . . good cause," <u>Vining v. Enter. Fin. Grp., Inc.</u>, 148 F.3d 1206, 1214; <u>see also</u> <u>Capstick</u> <u>v. Allstate Ins. Co.</u>, 998 F.2d 810, 814-15 (10th Cir. 1993) (affirming denial of JMOL where "from the very beginning without any investigation, [the insurer] treated the claim as a 'suspicious loss'" and "denied coverage without making any other bona fide investigation").

Another instance in which the jury may decide the issue is if there is evidence that the insurer "failed to adequately investigate [the] claim." <u>Timberlake</u>, 71 F.3d at 345. Crucially, however, "when a bad faith claim is premised on inadequate investigation, the [claimant] must make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information" that would have delegitimized the insurer's dispute of the claim. <u>Id.</u> That is, evidence of inadequate investigation must "suggest a sham defense or an intentional disregard of uncontrovertible facts" in order to be put to a jury. <u>Id.</u> To illustrate, where an insurer had interviewed a claimant, but had failed to question key individuals and therefore "had not completed an investigation [but rather] had only gotten one side of the story," JMOL was still warranted when such questioning "would not have changed the underlying <u>facts</u> already known to [the insurer], facts from which [the insurer] was entitled to form a reasonable belief" regarding its justification for denying the claim. <u>Id.</u>

## B. Analysis

We hold that a reasonable jury could not find, based on the evidence produced in this case, that State Farm did not actually rely on a legitimate reason in disputing

19

Bannister's insurance claim. Furthermore, we discern no evidence showing that State Farm failed adequately to evaluate or to investigate Bannister's insurance claim such that additional investigation would have materially altered the legitimate factual basis on which State Farm disputed Bannister's claim.

1. *Whether State Farm actually based its denial of Bannister's claim on a legitimate dispute as to whether Bannister's policy covered the accident*

First, to evaluate both the reasonableness of State Farm's denial of Bannister's claim in light of State Farm's knowledge at the time, it is necessary to identify the date of that denial.[11] See Timberlake, 71 F.3d at 344 (evaluating reasonableness "in light of the facts known or knowable to [the insurer] at the time it denied [the insured's] claim" (citing Buzzard v. McDanel, 736 P.2d 157, 159 (Okla. 1987))); see also ROA v. II at 409 (Jury Instruction no. 10). On this record and our required standard of review, we conclude that State Farm denied Bannister's claim on February 25, 2009, although if this issue were reviewed de novo we might well conclude that the proper date to use for the denial was March 17, 2009, or even June 9, 2009. Throughout the trial, Bannister

_____

[11] On appeal, Bannister emphasizes that he was never sent a proper claim-rejection letter by State Farm that explained the reasons for his denial, in violation of the Oklahoma Unfair Claims Settlement Practices Act, Okla. Stat. Ann. tit. 36, § 1250.7(A). However, an insurer's violation of the regulation under that Act does not give rise to an inference of bad faith in the context of this tort action. See Beers v. Hillory, 241 P.3d 285, 294 (Okla. Civ. App. 2010) ("[A] violation of the Act does not necessarily establish bad faith. An insurer may carelessly fail to perform some duty required by the statute with such frequency to warrant administrative sanction, but that does not establish more than negligent conduct in any individual case."); Badillo, 121 P.3d at 1094 (holding that, in bad faith cases, "the minimum level of culpability necessary for liability against an insurer to attach is more than simple negligence").

20

continually invoked the February 25 date as the end of State Farm's affirmative investigatory efforts and the day it definitively concluded that Bannister was at fault. That theory that the denial occurred on February 25 is supported by evidence (namely, the claim log as well as testimony), so drawing all reasonable inferences in favor of Bannister, see Magnum Foods, 36 F.3d at 1503, it is appropriate to use February 25 for our bad faith analysis.[12]

On February 25, the facts known to State Farm included that Bannister had been involved with a single-vehicle accident in which Bannister was unable safely to stop when the car in front of him braked suddenly; that the police report showed that Bannister had been driving under the influence of alcohol; and that there were no identified witnesses. These facts make State Farm's dispute of Bannister's eligibility for recovery reasonable. For one, Bannister had a duty to leave a safe, appropriate distance between himself and the vehicle ahead. See Okla. Stat. Ann. tit. 47, § 11-310(a) ("The driver of a motor vehicle shall not follow another vehicle more closely than is reasonable

___

[12] A State Farm employee in the UM division, Dani Conover, testified that Bannister's claim was still "open" as late as May 1, 2009, insofar as she was still reviewing Bannister's claim log at that point. However, Conover more or less conceded that she was aware of no further investigation done since February 25. Moreover, State Farm's corporate representative at trial, Jason Taylor, agreed that a determination of 100% liability on the part of Bannister had been made by February 25, although Taylor added that State Farm was open to considering any additional information and that it had asked Bannister to provide any he had. But in any case, drawing all reasonable inferences from the evidence in favor of Bannister, February 25 seems to be the appropriate date upon which to review the basis for State Farm's decision to deny coverage.

and prudent . . . .").[13]  Bannister's inability timely to stop when the vehicle in front of him applied its brakes tends to show that Bannister failed to observe his duty to leave a safe stopping distance, and that he was therefore at fault in his accident.  The reasonableness of deeming Bannister to be at fault based on that fact is bolstered by the fact that the driver in front of Bannister was able to stop safely even though that driver, not Bannister, was the one who was allegedly cut off by another vehicle.[14]  Additionally, the police report indicated that Bannister had been driving under the influence of alcohol.  While that fact did not dispositively preclude coverage under Bannister's policy, it certainly added to the reasonableness of finding Bannister negligent.  Meanwhile, there were no other identified witnesses who might have contradicted any of those facts.

Next, the evidence showed that State Farm, from its initial reaction to Bannister's claim to its ultimate denial of the claim, actually relied on the legitimate reasons listed above.  It is clear that State Farm relied at least on the facts about Bannister not having sufficient space between him and the vehicle in front of him timely to brake and avoid

---

[13] At trial, Bannister agreed that he had a duty to leave sufficient space between himself and the vehicle ahead to be able timely to react, and also said that he knew such space was greater for motorcycles, which cannot decelerate as swiftly as cars.

[14] State Farm liability representative Walker testified that a motorist might not be negligent if he hits something that jumps directly in front of him to cause an accident: e.g., in the present scenario, the beige car might not have been negligent if it had hit the red car that cut it off.  Walker emphasized that such a situation is crucially different, for the purposes of negligence evaluations, from Bannister's case, where the vehicle immediately in front of him simply stopped suddenly, and Bannister crashed as a result of that vehicle braking.

22

laying down his motorcycle. That itself is sufficient to give rise to a reasonable dispute about whether Bannister was majority at fault. State Farm may also have relied on the police report's notation that Bannister was driving under the influence; and that would only have bolstered the already reasonably supported conclusion that Bannister was majority at fault.

The first material entry in Bannister's claim log (entry no. 7, on January 23, 2009) recorded the facts of the accident as reported by Bannister and relayed to State Farm through his wife the day after the crash. At trial, Wendy Jeffus, who spoke with Bannister's wife and entered that log, said that the facts she recorded—i.e., that a vehicle in front of Bannister slammed on its brakes, causing Bannister to crash—were insufficient at that point to dictate who was at fault, since it was just one person's version of what had happened. However, Jeffus testified that if those facts were confirmed through subsequent investigation, then there would be reason to believe that Bannister was at least majority at fault for the accident, which would have disqualified him from UM coverage. The next material log entry (entry no. 14, on January 26, 2009), said that there was insufficient information on file to make a determination at that point and that further investigation was appropriate; but that it appeared that Bannister was majority at fault based on reasonable inferences from the facts of a single-vehicle crash where the car in front of the claimant stopped suddenly, and the claimant had insufficient room to stop himself.

After those entries, State Farm continued to rely on the crash scenario, but it also

became aware that the police report, obtained on by State Farm on February 17, 2009, indicated that Bannister had been driving under the influence of alcohol. State Farm representative Walker testified that Bannister's alcohol consumption was "a piece of the investigation," though not something upon which State Farm did, or could have, based its determination of liability exclusively. ROA v. III at 710. It is uncertain the extent to which State Farm took the police report's driving-under-the-influence notation into account in assessing Bannister's fault. To that end, the February 25 entry only noted that fact in the "comment" section of the log rather than the "analysis" section, though it is unclear how much of a difference, if any, such placement makes. Id. at 767. Walker—who reflected on but did not himself make the February 25 log entry determining Bannister's fault—testified that he would have denied Bannister's claim based solely on the crash scenario, independent of the driving-under-the-influence factor.

In sum, from the initial consideration of Bannister's claim through the February 25 denial of it, State Farm actually at least relied on the facts of the crash scenario—a single-vehicle accident where the car in front of the claimant braked suddenly, and the claimant had insufficient space timely to stop—and possibly also on the police report's notation that Bannister had been driving under the influence. The former reason alone is sufficient to create a legitimate dispute as to whether Bannister was at least majority at fault, and the latter reason would only add to the reasonableness of deeming Bannister at fault. Meanwhile, Bannister put forth no evidence that State Farm arbitrarily prejudged his claim or was otherwise engaged in systematic bad-faith denials of claims. See

24

Vining, 148 F.3d at 1214; Capstick, 998 F.2d at 815. Thus, we conclude that Bannister failed to produce evidence that State Farm did not actually dispute his insurance claim in good faith, as necessary to submit his legal claim to the jury under this theory of bad faith. See Timberlake, 71 F.3d at 344.

2. *Whether State Farm failed adequately to investigate Bannister's claim*

Even though State Farm had a reasonable, actually-relied-upon basis for denying Bannister's claim, the bad faith issue could still be sent to the jury to the extent that Bannister's theory is "premised on inadequate investigation." Timberlake, 71 F.3d at 345. However, to resist JMOL based on a theory of inadequate investigation, Bannister "must [have] ma[d]e a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information." Id.

We can reject this theory even assuming arguendo that State Farm's investigation of Bannister's claim was inadequate.[15] Bannister's argument fails on this ground because all that any further, reasonable investigation would have revealed, according to the record

---

[15] On the record before us, State Farm's investigation arguably was adequate. State Farm obtained Bannister's side of the story through his wife's initial account as well as through Mercado's later conversation with him, although that was under the auspices of a collision evaluation, not a liability interview; it obtained the police report; and there were no other identifiable witnesses to consult. Also, it is not apparent that State Farm was required, either by company policy or by law, electronically to record an interview with Bannister, as Bannister argues should have been done.

In any event, that does not change the fact that, to survive JMOL based on a theory of inadequate investigation, Bannister needed to put forth evidence showing that further investigation would have delegitimized State Farm's basis for disputing the claim. See Timberlake, 71 F.3d at 345. As discussed below, he did not do that.

25

before us, is what Bannister himself testified to at trial; and that testimony "would not have changed the underlying facts already known to [State Farm], facts from which [State Farm] was entitled to form a reasonable belief" regarding its justification for denying Bannister's claim. Timberlake, 71 F.3d at 345. That is, taking into account everything Bannister said at trial, State Farm still would have had before it the material facts of a single-vehicle accident with no identified witnesses (other than the claimant), where the claimant had not left sufficient space to brake and avoid crashing, and where the claimant was driving after the consumption of alcohol. Bannister's testimony did not contradict any material facts upon which State Farm based its legitimate dispute regarding Bannister's negligence.

On the contrary, upon further investigation Bannister would only have appeared more negligent, since the fact that he was speeding—a fact to which Bannister testified, but which was never noted in the claim log—would have come out. Further, if State Farm had obtained Bannister's hospital record from the aftermath of the accident (or had asked Bannister about the record and had received truthful answers), State Farm would have discovered that the hospital record indicated that Bannister's blood-alcohol level was 0.09.

On appeal, Bannister asserts that State Farm's investigation was inadequate, but he does not explain how further investigation would have helped his case for recovery under his insurance policy. For example, Bannister argues that "had State Farm taken a recorded statement, it could have and should have asked Bannister whether he was (1)

26

drunk, (2) speeding and/or (3) following too closely." Aplt. Br. at 23. However, he does not explain how the answers to those questions would have altered the factual basis on which State Farm reasonably disputed coverage. Critically, Bannister's truthful answers to those questions would have confirmed that his blood-alcohol level was above the legal limit[16]; that he was speeding by 5-10 mph; and that he was following too closely, as he did not leave sufficient room in front of him to stop, whereas the car in front of him—the car that was allegedly cut off, and therefore had greater reason to crash—managed safely to brake without collision.

Bannister argues that "[p]erhaps most significantly, a statement from Bannister would have provided State Farm with the opportunity to assess for itself Bannister's credibility," id. at 24, but Bannister's credibility in itself was not a "fact" upon which claim coverage was disputed, see Timberlake, 71 F.3d at 345. Bannister asserts that "a situation like this . . . turns on how an accident happened and the only evidence of that is the insured's testimony." Aplt. Br. at 24. But again, assuming State Farm had deemed Bannister credible, and Bannister had recounted in an interview the same things he recounted at trial, State Farm still would have had the same material facts before it. And as discussed above, those facts support a good-faith dispute of Bannister's claim-recovery eligibility, given the apparent degree of Bannister's fault.

Bannister also argues in his reply brief that State Farm should have made efforts to

---

[16] In Oklahoma, it is unlawful to operate a motor vehicle with a blood-alcohol concentration of 0.08 or more. Okla. Stat. Ann. tit. 47, § 11-902(A)(1).

27

contact the alleged driver from a truck behind Bannister who stopped to help him after the accident, as that person could have been a witness. However, that alleged individual was never noted in a police report, and Bannister never gave, nor at trial professed to possess, any contact information for that individual. Accordingly, State Farm—whose duty it was simply to undertake an investigation that was reasonable under the circumstances, see Buzzard, 824 P.2d at 1109—cannot be faulted for not seeking out some unknown and reasonably unknowable person.

In conclusion, Bannister failed to "make a showing that material facts were overlooked or that a more thorough investigation would have produced relevant information" that would have delegitimized the insurer's dispute of the claim. Timberlake, 71 F.3d at 345. As such, his inadequate-investigation theory of bad faith is without merit, and JMOL in favor of State Farm was appropriate.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of JMOL to State Farm.[17] We therefore DISMISS AS MOOT State Farm's cross appeal.

---

[17] In light of our holding, Bannister is not a prevailing party, and therefore is not entitled to attorney's fees under Okla. Stat. Ann. tit. 23, § 103, as he contends.