2005 OK CIV APP 9

**Ernest STRONG, Plaintiff/Appellant,**

v.

**HANOVER INSURANCE COMPANY, Defendant/Appellee.**

No. 100,812.

Court of Civil Appeals of Oklahoma,
Division No. 4.

Sept. 28, 2004.

Rehearing Denied Oct. 25, 2004.

Certiorari Denied Jan. 18, 2005.

Jerry D. Lundy, The Lundy Law Firm, P.L.L.C., Broken Arrow, OK, for Plaintiff/Appellant.

James K. Secrest, II, Edward J. Main, Richard C. Honn, Secrest, Hill & Butler, Tulsa, OK, for Defendant/Appellee.

Opinion by RONALD J. STUBBLEFIELD, Judge:

¶ 1 This an appeal by the insured party Ernest Strong from order of the District Court of Tulsa County granting summary judgment to his uninsured motorist carrier, Hanover Insurance Company. The appeal stands assigned to the accelerated docket pursuant to Oklahoma Supreme Court Rule 1.36, 12 O.S.2001, ch. 15, app. 1. Based on our review of the record on appeal and applicable law, we reverse and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

¶ 2 Plaintiff Ernest Strong was involved in a rear-end automobile collision. Strong was stopped at an intersection stop sign, when another driver, seventeen-year-old Marty Thurman, negligently drove his vehicle into the back of Strong's automobile. Strong's wife, Kathryn, and their children were also in the vehicle, and both Strong and his wife claimed to have suffered bodily injuries as a result of the accident.

¶ 3 At the time of the accident, Strong was the sole named insured on an automobile liability insurance policy issued by Hanover. The policy included medical payment coverage with a limit of $5,000 per person, and uninsured/underinsured motorist (UIM) coverage with a limit of $250,000 per person/$500,000 per accident. Thurman was covered by automobile liability insurance, and it later would be revealed that the coverage had a $100,000 liability limit.

¶ 4 Strong reported the accident to his insurance agent, Chuck Welch, who notified a Hanover claims office. The Strongs received monies from Hanover under the medical payment provision of the policy. Several checks were issued, eventually exhausting the $5,000 policy limit for that particular coverage. The record contains a copy of one check Hanover issued on January 20, 1997, in the amount of $892, made jointly payable to Kathryn Strong and one of her medical service providers. A copy of the envelope of the letter is also included in the evidentiary materials, and it indicates the check was mailed from a Hanover office in Itasca, Illinois, to the office of Strong's attorney. The check contains the notation: "THE ADJUSTER HANDLING THIS CLAIM IS JOHN ALLSTON." The

check states the claim number: "161817300200."

¶ 5 On September 4, 1998, the Strongs filed a negligence action against Thurman in the District Court of Pottawatomie County, Oklahoma, seeking damages for permanent injuries, pain and suffering, loss of future income, and future medical expenses, including expenses for surgery. The petition alleged that Strong had already incurred medical expenses from the accident in excess of $20,000, and that his wife had sustained damages in excess of $10,000. The case was set for mediation, which resulted in an agreement to settle with Thurman and his insurer for the $100,000 policy limit.

¶ 6 Strong entered into the settlement with Thurman on February 12, 1999, releasing him and his liability insurer from all claims arising out of the accident. The "Release of All Claims and Indemnity Agreement" also released Marvin Thurman, the vehicle owner. On the same day, the Strongs dismissed their case against Thurman with prejudice.

¶ 7 On November 9, 2000, the Strongs' attorney, Roland V. Funk, sent a letter addressed to Terry Lauderdale at Hanover's Oklahoma City claims office, advising Lauderdale of his representation of Strong in regard to the "underinsured policy." The letter referenced the same claim number which had appeared on the check for medical payments, and explained that Strong had undergone surgeries and had an implant device installed to alleviate pain.

¶ 8 Hanover's response was a December 22, 2000, letter from claims specialist, James Hilliard, sent from a claims office in Tulsa, Oklahoma. The letter requested that attorney Funk provide (1) an affidavit from the responsible owner and/or operator of the responsible vehicle indicating liability policy limits applicable to the loss; (2) names and addresses of all involved insurance companies and their representatives; (3) copies of all current medical reports and bills incurred as a result of the accident; (4) copies of any statements from parties associated with the accident; and (5) authorization forms signed by Strong to allow Hanover to verify medical and wage loss information. Documentation in the record tends to indicate that Strong provided the requested information.

¶ 9 When Hanover did not make any payment of UIM benefits, Strong filed this action seeking to recover his policy limit of $250,000. Hanover answered, and as one of its affirmative defenses claimed Strong was barred from recovering under the policy because of his dismissal of claims against the tortfeasor with prejudice and execution of a release, which Hanover claimed prejudiced its right of subrogation.

¶ 10 Hanover filed a motion for summary judgment based on the contention that Strong had prejudiced Hanover's subrogation rights and under *Porter v. MFA Mutual Insurance Co.*, 1982 OK 23, 643 P.2d 302, was barred from recovery of any additional benefits from Hanover. In its supporting brief, Hanover asserted that its first notice of Strong's intent to make a UIM claim was the November 9, 2000, letter written by Strong's attorney. Hanover set forth several alternatives that Strong could have pursued that would not have destroyed Hanover's rights and barred his claim. Hanover argued that Strong (1) could have notified it earlier that he wanted to make a UIM claim under his policy; (2) could have notified it of his action against the tortfeasor, in which event Hanover could have intervened in the action to protect its right of subrogation; and (3) should have notified it of the offer of policy limits from the tortfeasor's liability insurance carrier, which would have given Hanover the opportunity to substitute its payment for that policy limit.

¶ 11 Strong filed a response and objection to Hanover's motion for summary judgment, and attached evidentiary materials. He maintained that he had done all of the things which Hanover claimed would have saved his claim—that he had (1) made a claim for UIM benefits at the time he originally notified his agent of the accident; and (2) notified Hanover of both the lawsuit against Thurman and the scheduled mediation. He pointed out that several different Hanover adjusters and claims offices had handled his claim file. The Trial Court denied Hanover's motion for summary judgment.

¶ 12 Several months later, after the parties had completed discovery, Hanover filed an application for leave to file a second motion for summary judgment. This was because the time had passed under the Trial Court's scheduling order for filing dispositive motions. Hanover sought to revisit "the possible issue of fact concerning whether or not [Strong] had requested and was granted permission from [Hanover] to settle with the tortfeasor and enter into a release and dismissal with prejudice." Over Strong's objection, the Trial Court granted Hanover leave to file the motion.

¶ 13 Hanover's second motion for summary judgment was based on the following allegations: (1) On January 29, 1999, Strong mediated his negligence action against the tortfeasor and as a result executed a release and satisfaction of claims and dismissed the action with prejudice; (2) Strong did not comply with the "substitute payment" provisions of 36 O.S.2001 § 3636(E), or similar provisions within his policy, before completely releasing the tortfeasor; and (3) Strong's claim for UIM benefits was completely barred under the *Porter* doctrine by reason of his "active destruction" of Hanover's subrogation rights.

¶ 14 Strong filed a response and objection to Hanover's second motion for summary judgment. Following a hearing, the Trial Court granted summary judgment in Hanover's favor. Strong appeals.

## STANDARD OF REVIEW

¶ 15 "[T]he appellate standard of review of a trial court's grant of summary judgment is *de novo*." *Carmichael v. Beller*, 1996 OK 48, ¶ 2, 914 P.2d 1051, 1053 (citation omitted). On review, this Court "will examine the pleadings and evidentiary materials submitted by the parties to determine if there is a genuine issue of material fact." *Id.* "[A]ll inferences and conclusions to be drawn from the evidentiary materials must be viewed in the light most favorable to the non-moving party." *Id.* This Court will reverse the grant of summary judgment where it appears from the evidentiary materials that

the material facts concerning issues raised in the case are conflicting or, if the material facts are undisputed, reasonable persons in the exercise of fair and impartial judgment might reach different conclusions from those facts. *Buck's Sporting Goods, Inc. v. First Nat'l Bank & Trust Co.*, 1994 OK 14, ¶ 11, 868 P.2d 693, 697–98. Furthermore, this Court will reverse the grant of summary judgment if the movant has not addressed all of the material facts, or if one or more of such facts is not supported by evidentiary material. *Spirgis v. Circle K Stores, Inc.*, 1987 OK CIV APP 45, ¶ 10, 743 P.2d 682, 685 (Approved for publication by order of the Oklahoma Supreme Court).

¶ 16 Where summary judgment is granted based on a defendant's affirmative defense against liability, the record must show no substantial controversy as to facts that are material to the affirmative defense, and that the facts and inferences that may be drawn from them are in the defendant's favor. *Martin v. Chapel, Wilkinson, Riggs and Abney*, 1981 OK 134, ¶ 7, 637 P.2d 81, 84 (footnote omitted). Once the defendant has made the appropriate showing, the plaintiff "must then demonstrate the existence of a material fact that would justify a trial of the issue." *Id.* (Footnote omitted.)

¶ 17 We have reviewed the record and conclude that Strong has met his burden of demonstrating that material facts remain in dispute. Under the facts and circumstances of this case, we are unable to conclude, as a matter of law, that *Porter* provides Hanover an absolute defense to payment under Strong's policy.

## DISCUSSION OF ISSUES

### I. Hanover's Notice of Strong's UIM Claim

¶ 18 At the time of its first motion for summary judgment, Hanover denied receiving notice of commencement of Strong's action against the tortfeasor or prior notice of the pending mediation. However, Strong produced evidentiary materials to the contrary.[1] Now, on appeal, Hanover concedes it

1. In a letter dated October 29, 1998, Strong's attorney sent Hanover a letter in which he en-

did have notice of both events.[2]

¶ 19 Hanover still does maintain that Strong did not at any time assert a UIM claim prior to his settlement with and release of his claims against Thurman. According to Hanover, it was under no obligation to take any action with respect to a UIM claim that had not yet been submitted.

¶ 20 In this regard, the summary judgment materials indicate that on October 3, 1996, Strong telephoned the office of his insurance agent to report the accident. Strong had obtained his coverage with Hanover from agent, Chuck Welch, at the McLemore Insurance Agency.[3] Strong's phone call to the agent generated a fill-in-the-blank form entitled "ACORD™ AUTOMOBILE LOSS NOTICE" (hereafter ACORD Notice) which requested details regarding the accident, the insured, the insured's policy and the other driver. Strong's name and that of his wife were typed in as "Injured."

¶ 21 Under the section "Policy Information," the ACORD Notice requested the limits for various coverages under Strong's policy. All of these blanks were also filled in with type-written responses, except for the blank requesting information regarding "Other Coverage & Deductibles (*U.M.*, no-fault, towing, etc.)." (Emphasis added.) That space contained a hand-written notation consisting of what appears to be three letters—possibly initials or an abbreviation/acronym, the meaning of which is unclear and cannot be ascertained from this record. Typed in a space designated for "Remarks" was the following: "Insured has filed damage to vehicle under the Thurman's auto policy. They are only filing medical payments under this policy."

¶ 22 It is unclear who at the McLemore agency completed the ACORD Notice, but the form was signed by agent, Chuck Welch,

and the fax header indicates it was sent to and received by "Hanover Claims—Tulsa" on October 3, 1996, the initial date Strong reported the accident. The record indicates that Strong's counsel received a copy of the ACORD Notice sometime after filing suit against Hanover.

¶ 23 Strong has presented evidentiary materials disputing the ACORD Notice statement that he was only filing for medical payments coverage. In an affidavit, and later in his deposition, Strong stated that after his initial report to the McLemore Agency he had numerous other conversations with Welch regarding availability of his UIM coverage. He felt that Welch was not acting in accordance with his best interests, and stated that Welch seemed "quite anxious" for him to settle with Thurman's liability insurer. Strong stated that, at one point, Welch tried to persuade him to settle with the tortfeasor "for a couple of thousand dollars and move on ... since my injuries would be better." Strong also stated that in November 1996, he had "a very heated telephone conversation with Mr. Welch about these matters."

¶ 24 As noted above, Hanover asserted, as one of its grounds for judgment, that Strong had not at any time requested payment under his UIM coverage before settling with Thurman. Strong's testimony and other evidentiary materials contradict that assertion. The summary judgment record reveals a disputed issue of material fact regarding the point when Strong first claimed his UIM policy benefits, and thus, a dispute as to Hanover's claim that it had no duty to act to protect its subrogation rights.

## II. Substitute Payment Provisions and Impairment of Subrogation Rights

¶ 25 The terms of Strong's policy required him to give Hanover written notice by certi-

---

2. Hanover's "Statement of the Case" attached to its response to Strong's petition in error states: "Appellant did provide appellee notice of the commencement of his action against the tortfeasor and of the pending mediation."

3. In a deposition taken on behalf of Hanover in January 2004, Strong testified that Chuck Welch was an insurance broker, who represented various insurance companies in addition to Hanover.

---

closed copies of the petition and summons in the Thurman lawsuit. The letter expressed the hope that Thurman's liability insurer would settle for policy limits prior to trial, and stated that Strong "will need all of his medical pay benefits and will need to seek UM coverage as well." In a second letter dated January 25, 1999, counsel for Strong advised claims adjuster, John Allston, of the dates set for mediation and trial.

fied mail of a tentative settlement agreement made with Thurman's liability insurer, provide written documentation of economic losses, and written authorization for Hanover to obtain reports from employers and medical providers. The policy terms allow Hanover sixty days to decide whether to advance payment to Strong equal to the tentative settlement—substitute its payment for that of the tortfeasor—or waive subrogation. These duties were imposed by a 1992 endorsement to Strong's policy.

¶ 26 Below, Strong claimed that he had maintained his automobile insurance with Hanover since 1989, and had no knowledge of any policy obligation beyond simply mailing notice of commencement of litigation against the tortfeasor and providing notice of pending mediation. However, the duties imposed by the 1992 policy endorsement track the language in an amendment to 36 O.S. 2001 § 3636(E), effective November 1, 1989. *See* 1989 Okla. Sess. Laws, ch. 98, § 1. Thus, Strong was charged with notice of this statutorily imposed obligation.

¶ 27 The pertinent language of section 3636(E) remains unchanged in the current version of the uninsured motorist statute and provides:

In the event of payment to any person under the coverage required by this section ... the insurer making such payment shall, to the extent thereof, be entitled to the proceeds of any settlement or judgment resulting from the exercise of any rights of recovery of such person against any person or organization legally responsible for the bodily injury for which such payment is made.... Provided further, that if a tentative agreement to settle for liability limits has been reached ·with an insured tort-feasor, written notice shall be given by certified mail to the uninsured motorist coverage insurer by its insured. Such written notice shall include:

1. Written documentation of pecuniary losses incurred, including copies of all medical bills; and

2. Written authorization or a court order to obtain reports from all employers and medical providers. Within sixty (60) days of receipt of this written notice, the uninsured motorist coverage insurer may substitute its payment to the insured for the tentative settlement amount. The uninsured motorist coverage insurer shall then be entitled to the insured's right of recovery to the extent of such payment and any settlement under the uninsured motorist coverage. If the uninsured motorist coverage insurer fails to pay the insured the amount of the tentative tort settlement within sixty (60) days, the uninsured motorist coverage insurer has no right to the proceeds of any settlement or judgment, as provided herein, for any amount paid under the uninsured motorist coverage.

36 O.S.2001 § 3636(E).

¶ 28 However, there is no language in this section that precludes recovery of UIM benefits as a matter of law when an insured fails to follow the precise letter of the notice-of-settlement provision. Indeed, one Court has recognized that to do so would violate the central goal of section 3636, which is to protect victims injured by uninsured or underinsured motorists by ensuring payment of damages. *Phillips v. New Hampshire Ins. Co.*, 263 F.3d 1215, 1225 (10th Cir.2001)(citing *Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 2000 OK 55, ¶ 30, 11 P.3d 162, 173). Referring to section 3636(E) as a "speedy payment mechanism" to accomplish that goal, the Court in *Phillips* stated: "The purpose of the notice requirement is to trigger the speedy payment mechanism and to enable the insurer to protect any subrogation rights it may wish to preserve—not to serve as a hurdle for recovery." *Phillips*, 263 F.3d at 1225.

¶ 29 In view of (1) the evidentiary materials indicating that Strong claimed UIM coverage both at the time of reporting the accident and when forwarding the Thurman lawsuit papers to Hanover; and (2) Hanover's admitted knowledge of the lawsuit filed against Thurman and admitted notice of the scheduled mediation, we are unable to conclude, as a matter of law, that Strong's technical breach of the notice of settlement provision prevented Hanover from protecting its subrogation rights. The Oklahoma Su-

preme Court has noted that " 'the initial responsibility to act to protect subrogated rights rests upon the insurer,' " *Sexton v. Continental Cas. Co.*, 1991 OK 84, ¶ 17, 816 P.2d 1135, 1138 (quoting *Selected Risks Ins. Co. v. Dierolf*, 138 N.J.Super. 287, 350 A.2d 526, 529 (1975)), and that "[a]n insurer must aid its insured in the preservation of its subrogation rights." *Sexton* at ¶ 17, 816 P.2d at 1138 (quoting *McDonald v. Republic–Franklin Ins. Co.*, 45 Ohio St.3d 27, 543 N.E.2d 456, 460 (1989)). Certainly, an insurer may waive its right to subrogation or be estopped to assert it due to its conduct. *See Buzzard v. Farmers Ins. Co.*, 1991 OK 127, ¶¶ 34–42, 824 P.2d 1105, 1113–14. In this instance, the affidavit and deposition assertions by Strong that Hanover's agent affirmatively urged him to settle with the tortfeasor provide strong support for a ·possible estoppel.

¶ 30 In *Porter v. MFA Mutual Insurance Co.*, 1982 OK 23, ¶ 14, 643 P.2d 302, 305 (footnote omitted), the Oklahoma Supreme Court recognized that "as a general rule an insured who deprives insurer, by settlement and release, of its right of subrogation against the wrongdoer thereby provides insurer with a complete defense to an action on the policy." However, in subsequent cases the Court has determined that the general rule was not applicable and declined to apply *Porter* to avoid a forfeiture of coverage.

■ ¶ 31 For example, in *Sexton*, the Court held that the rule does not apply when a UM carrier denies its insured coverage prior to the settlement and release of the tortfeasor. *Sexton*, 1991 OK 84 at ¶ 11, 816 P.2d at 1136–37. In reaching its decision, the Court in *Sexton* recognized that whether destruction of the UM carrier's right to subrogation constitutes a complete defense to its insured's action on the policy "depends upon whether there is a prior breach of contract or waiver or estoppel on the part of the insurer which of itself cancels out its right to demand subrogation as a condition of payment." *Id.* at ¶ 12, 816 P.2d at 1137 (quoting *Allstate Ins. Co. v. Austin*, 120 Ga.App. 430, 170 S.E.2d 840, 843 (1969)).

■ ¶ 32 Thus, under Oklahoma law, it is clear that equitable considerations come into play when a UM carrier seeks to avoid payment of a claim based on allegations that the insured has prejudiced its subrogation rights. The carrier's legal ability to exercise subrogation rights is not an indispensable condition of its obligation to pay an otherwise valid UIM claim. *See Phillips*, 263 F.3d at 1222.

¶ 33 We note that in *Porter*, the insured accepted the liability policy limits in settlement of his claims and gave the tortfeasor and his insurance carrier a general release. The insured did so without (1) filing a lawsuit against the tortfeasor, (2) providing his UIM carrier prior notice of the liability carrier's offer of policy limits, and (3) providing his UIM carrier notice that he would accept the offer of policy limits in settlement. *Porter*, 1982 OK 23 at ¶¶ 2–3, 643 P.2d at 303. The insured in *Porter* had merely informed his UIM carrier "that [he] would expect payment under his policies ... if [the tortfeasor's] carrier paid only policy limits." *Id.* at ¶ 2, 643 P.2d at 303.

¶ 34 In this case, Strong did file a lawsuit against the tortfeasor, and did give Hanover notice of that fact. In addition, Strong notified Hanover of a scheduled mediation, and his evidentiary materials support a conclusion that he also notified the insurer of the prospect of settlement at mediation for the policy limits of the tortfeasor's insurance coverage. Unlike the facts in *Porter*, it is certainly not undisputed that Hanover lacked the opportunity to preserve its subrogation rights.

## CONCLUSION

¶ 35 The evidentiary materials as a whole reveal disputed material facts concerning Hanover's notice of Strong's UIM claim and whether it had sufficient opportunity to preserve its subrogation rights. The record also reveals a dispute of material fact over whether Hanover should be estopped from relying on *Porter* and claiming prejudice due to Strong's settlement with and release of the under-insured ·tortfeasor.[4] Therefore, we

---

4. We note that the summary judgment record is

silent in regard to Hanover's likelihood of recov-

find that Hanover was not entitled to judgment as a matter of law, and conclude that the Trial Court erred in granting Hanover's motion for summary judgment.

¶36 REVERSED AND REMANDED.

GOODMAN, J., and REIF, J. (sitting by designation), concur.

ery against the tortfeasor, who was 17-years-old at the time of the accident.