**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**December 2, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

BRIAN SHOTTS,

     Plaintiff - Appellant,

v.

GEICO GENERAL INSURANCE
COMPANY, d/b/a GEICO among other
names,

     Defendant - Appellee.

No. 18-6206

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:16-CV-01266-SLP)**
_____

Clifton Naifeh of Naifeh & Associates, Norman, Oklahoma, for Plaintiff – Appellant.

Gerard F. Pignato (Justin R. Williams with him on the brief) of Roberson, Kolker, Cooper, & Goeres, P.C., Oklahoma City, Oklahoma, for Defendant – Appellee.
_____

Before **MATHESON**, **PHILLIPS**, and **MORITZ**, Circuit Judges.
_____

**MATHESON**, Circuit Judge.
_____

     In 2014, Brian Shotts was injured in a car accident caused by Dana Pollard. Mr.

Shotts's automobile insurance through GEICO General Insurance Company ("GEICO")

included underinsured motorist ("UM") coverage.[1]  Ms. Pollard had automobile

insurance through Farmers Insurance ("Farmers").

Mr. Shotts filed a claim with Farmers, which offered Ms. Pollard's policy limits as

settlement.  Before accepting the offer, Mr. Shotts notified GEICO of the accident.

GEICO opened a claim, assigned an adjuster, and began an investigation.  GEICO also

waived its subrogation rights, allowing Mr. Shotts to accept the offer from Farmers.

GEICO's investigation determined that Mr. Shotts's injuries exceeded Ms.

Pollard's policy limits by $3,210.87.  GEICO offered Mr. Shotts a settlement of that

amount, but Mr. Shotts declined the offer as "unreasonably low."  App., Vol. 5 at 144.

Mr. Shotts demanded GEICO promptly "pay the first dollar of his claim, up to the value

of [the] claim or the total available UM limits" of $25,000.  *Id.* at 143.[2]  He also asked

GEICO to reevaluate the offer.  In response, GEICO requested additional information

---

[1] As explained in greater detail below, UM coverage protects drivers from
accidents and injuries caused by individuals who have no insurance or who do not have
enough coverage to pay the full value of a claim.  When an individual is involved in an
accident with an underinsured or uninsured motorist, the individual's UM coverage pays
for the amount not covered by the at-fault underinsured motorist's insurance.
     The parties and Oklahoma case law use the abbreviations "UM" and "UIM"
interchangeably to refer to uninsured and underinsured motorist coverage.  In this
opinion, we use "UM."

[2] As discussed in greater detail below, Oklahoma courts refer to this as the "first-
dollar payment" requirement.  Under this requirement, if an insured individual is injured
by an underinsured motorist and his or her injuries exceed the underinsured driver's
policy limits, the UM insurer must promptly pay the full value of the UM claim up to the
UM policy limits.

2

about Mr. Shotts's injuries. It then proposed a peer review to determine whether his injuries exceeded the $3,210.87 offer.

Mr. Shotts sued for bad faith breach of contract, alleging that GEICO acted in bad faith by (1) conducting "a biased and unfair investigation and evaluation of [his] claim" and (2) failing to pay the full value of his claim. App., Vol. 1 at 30-31. He also requested punitive damages. The district court granted summary judgment for GEICO on both bad faith claims and denied punitive damages. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. BACKGROUND

Before describing the factual and procedural background of this case, we provide a brief overview of Oklahoma's laws regarding UM insurance coverage and subrogation. We then discuss the events leading to this appeal.

### A. *UM Coverage and Subrogation Overview*

#### 1. Uninsured Motorist Coverage

UM coverage pays for damage or injuries caused by uninsured or underinsured drivers (the "underinsured driver" or "at-fault driver").[3] It "applies in the situation where the tortfeasor [i.e., the driver who causes an accident] is without insurance or where the tortfeasor has insufficient insurance to satisfy the claim of the insured." *Buzzard v.*

---

[3] In this opinion, we use the term "UM" coverage to refer to both underinsured motorist coverage and uninsured motorist coverage. We use the term "underinsured motorist" to describe both underinsured motorists and uninsured motorists.

3

*Farmers Ins. Co.*, 824 P.2d 1105, 1110 (Okla. 1991). Put differently, if an individual is in an accident caused by an underinsured at-fault driver, UM coverage will cover what the underinsured driver's insurance does not.

Under Oklahoma law,[4] every vehicle insurance policy must include UM coverage. Okla. Stat. Ann. tit. 36, § 3636[5]; *Buzzard*, 824 P.2d at 1110. Because of this, an individual typically receives UM coverage through the same insurer that provides the person's automobile insurance (the "primary insurer," "UM insurer," or "UM carrier").

Oklahoma considers UM coverage primary, or first-party, coverage. *See Buzzard*, 824 P.2d at 1110; *see also Mustain v. U.S. Fid. & Guar. Co.*, 925 P.2d 533, 536 (Okla. 1996) ("[A]s between the insurer and its insured UM insurance is primary coverage."). Coverage is "primary" when an individual's "insurer is liable without regard to any other insurance coverage available." *Equity Mut. Ins. Co. v. Spring Valley Wholesale Nursery*,

---

[4] Because our jurisdiction is based on the parties' diversity of citizenship, 28 U.S.C. § 1332, we apply the substantive law of the forum state—Oklahoma. *Klaxon Ins. Co. v. Stenor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Clark v. State Farm Mut. Auto. Ins. Co.*, 433 F.3d 703, 709 (10th Cir. 2005).

[5] The statute states, in pertinent part,

> No policy insuring against loss resulting from liability . . . for bodily injury or death . . . arising out of the ownership, maintenance or use of a motor vehicle shall be issued, delivered, renewed, or extended in this state . . . unless the policy includes . . . coverage . . . for the protection of persons insured thereunder who are legally entitled to recover damages from owners or operators of uninsured motor vehicles . . . .

Okla. Stat. Ann. tit. 36, § 3636(A)-(B).

747 P.2d 947, 954 (Okla. 1987).[6]  In other words, an individual injured by an underinsured driver does not need to exhaust the at-fault driver's policy limits before making a UM claim with his or her primary insurer.  *See Mustain*, 925 P.2d at 535 ("[T]he UM insurer may not withhold payment . . . on the sole basis that the liability insurance has not been exhausted."); *Buzzard*, 824 P.2d at 1112 (noting that "exhaustion of limits is not required as a condition precedent to [UM] recovery").

2.  **Subrogation**

"Subrogation simply means substitution of one person for another; that is, one person is allowed to stand in the shoes of another and assert that person's rights against a third party." *US Airways, Inc. v. McCutchen*, 569 U.S. 88, 97 n.5 (2013) (quotations omitted); *see also* 16 Couch on Ins. § 222:5 ("'Subrogation' is the substitution of another person in place of the creditor to whose rights [the substitute] succeeds in relation to the debt[.]  [Subrogation] gives to the substitute all the rights . . . of the [creditor].").  "[A] subrogated insurer stands in [the] shoes of an insured" and "is subrogated in a corresponding amount to the insured's right of action against any other person responsible for the loss, such that the insurer is entitled to bring an action against this third party . . . ."  16 Couch on Ins. § 222:5.

---

[6] "Secondary" or "excess" coverage, by contrast, is available "only after any primary coverage—*other insurance*—has been exhausted." *Equity Mut. Ins. Co.*, 747 P.2d at 954.

In Oklahoma, UM insurers enjoy statutory subrogation rights. Okla. Stat. Ann. tit. 36, § 3636(F). These rights allow UM insurers to pay an insured's claim and then seek reimbursement from the underinsured at-fault driver's insurer. This process operates as follows. When insured individuals involved in an accident with an underinsured driver reach a tentative agreement to settle with that driver's insurer, they must notify their UM insurer and submit documentation of any pecuniary losses. *Id.* § 3636(F)(1). The UM insurer then has 60 days to "substitute its payment to the insured for the tentative settlement amount"—that is, to pay the injured individual the amount owed by the underinsured driver's insurer. *Id.* § 3636(F)(2). If the UM insurer chooses to substitute payment, the injured individual receives payment for the entire value of the claim directly from the UM insurer but loses the right to receive any payment from the underinsured driver's insurer. The UM insurer is then "entitled to the insured's right of recovery," *id.*, and can exercise its subrogation rights to seek repayment from the underinsured motorist's insurer.[7]

---

[7] "It is not unreasonable to ask, upon confronting the extensive and complicated field of subrogation, why the law countenances a system under which [the] insurer first settles with [the] insured, then . . . pursues [the] responsible party." 16 Couch on Ins. § 222:4. As one scholar explains,

> Several policy considerations underlie the doctrine of subrogation. First, subrogation has its genesis in the principle of indemnity. Although an insured is entitled to indemnity from an insurer pursuant to coverage provided under a policy of insurance, the insured is entitled only to be made whole, not more than whole. Subrogation prevents an insured from obtaining one recovery from the insurer under its contractual obligations and a second recovery from the tortfeasor under general tort principles. Additionally, subrogation rights

6

A UM insurer may waive its subrogation rights. *See Buzzard*, 824 P.2d at 1110. It may also forfeit the rights by failing to substitute payment within 60 days. *See* Okla. Stat. Ann. tit. 36, § 3636(F)(2) ("If the [UM] coverage insurer fails to pay the insured the amount of the tentative tort settlement within sixty (60) days, the [UM] coverage insurer has no right to the proceeds of any settlement or judgment . . . .").

### 3. First-Dollar Payment Requirement

As just explained, Oklahoma law requires UM insurers to substitute payment within 60 days of learning of an individual's claim or waive their subrogation rights. *See id*. Oklahoma courts have labeled this requirement as a "speedy payment mechanism," *Phillips v. N.H. Ins. Co.*, 263 F.3d 1215, 1225 (2001), and have specified that it "entitle[s] [injured parties] to swift payment" of UM policy benefits, *Mustain*, 925 P.2d at 535. If an individual is damaged or injured by an underinsured driver, the UM insurer

> enable the insurer to recover payments to the insured, who theoretically should have been made whole through those payments. Finally, subrogation advances an important policy rationale underlying the tort system by forcing a wrongdoer who has caused a loss to bear the burden of reimbursing the insurer for indemnity payments made to its insured as a result of the wrongdoer's acts and omissions.

Elaine M. Rinaldi, *Apportionment of Recovery Between Insured and Insurer in a Subrogation Case*, 29 Tort. & Ins. L.J. 803, 803 (1994).

Subrogation is not always beneficial to the insurer, however. Rather, "[i]nsurers must . . . assess whether pursuing the third party [through subrogation] will be cost effective or too time consuming." 16 Couch on Ins. § 222:4. An insurer may decide to waive its subrogation rights if "the relative fault of the insured and third parties, the dollar amount of the loss, . . . the estimated cost of legal prosecution of the claim," or other factors indicate that the action will not be "economically feasible." *Id.*

7

"may not delay the payment of benefits until exhaustion of [the other driver's policy] liability limits." *Buzzard*, 824 P.2d at 1112. Instead, the UM insurer "must take prompt action to determine what payment is due." *Id.* If, "after investigation, [it] determines that the likely worth of the claim exceeds the liability limits [of the underinsured at-fault driver's policy], prompt payment must be offered." *Id.*

In *Burch v. Allstate Insurance Company*, 977 P.2d 1057 (Okla. 1998), the Oklahoma Supreme Court held that "[a UM] carrier is liable for the *entire amount* of its insured's loss from the first dollar up to the UM policy limits without regard to the presence of any other insurance." *Id.* at 1058 (emphasis added). In other words, if an individual is injured by an underinsured driver, and if the individual's injuries exceed the underinsured driver's policy limits, the UM insurer must promptly pay the full value of the UM claim, as capped by the UM policy limits. Following the parties, we refer to this as the "first-dollar payment" or "drop-down payment" requirement.

Once a UM insurer pays the full value of an injured party's claim, as capped by the UM policy limits, the injured party can no longer seek recovery from the underinsured driver's insurance. Rather, the UM insurer "stands in [the] shoes of [the] insured," 16 Couch on Ins. § 222:5, and can exercise its statutory subrogation rights "to proceed in its own right against the [at-fault underinsured driver]," *Burch*, 977 P.2d at 1065. The first-dollar payment requirement thus "does not make the UM carrier the final indemnitor for the injured party's loss." *Id.* It also does not allow an injured party to recover twice—once from the UM insurer and once from the underinsured driver's

8

insurer—for his or her injuries. Instead, the requirement "is only a temporary expedient to facilitate prompt payment to the [injured party]." *Id.*

## B. *Factual Background*

### 1. Pre-Accident Medical History

Beginning in 2001, Mr. Shotts visited multiple doctors with complaints of back and neck pain. Between March 2007 and May 2011, he saw the same physician at least 33 times to receive treatment for his back. Between September 2011 and April 2013, he received treatment from a chiropractor at least 15 times. He also had several x-rays and MRIs, which revealed minor spinal abnormalities. His physicians prescribed medications to treat his pain and encouraged him to take Ibuprofen and Tramadol daily.

### 2. Accident and Insurance Policy

On June 14, 2013, Mr. Shotts was involved in a car accident caused by Dana Pollard. He received hospital treatment for injuries to his back, elbow, and neck.

Mr. Shotts had automobile insurance through GEICO. His policy included UM coverage in the amount of $25,000 per person. It also contained a subrogation provision that stated:

> When payment is made under this policy, [GEICO] will be subrogated to all the *insured's* rights of recovery against others. The *insured* will help us to enforce these rights. The *insured* will do nothing after loss to prejudice these rights. This means [GEICO] will have the right to sue for or otherwise recover the loss from anyone else who may be held responsible.

App., Vol. 2 at 95.

Ms. Pollard had automobile coverage through Bristol West, a subsidiary of Farmers. Her policy had a liability limit of $25,000.

3. **Post-Accident Medical History**

After the accident on June 14, 2013, Mr. Shotts was admitted to the emergency department at the Comanche County Memorial Hospital. He reported "generalized soreness" and rated his pain as "2/10 to 3/10." *Id.* at 79. The treating physician recorded Mr. Shotts's condition as "[m]otor vehicle collision with musculoskeletal pain and muscle spasm." *Id.* at 80.

Over the next several years, various physicians concluded that "Mr. Shotts's [preexisting back] condition ha[d] been exacerbated by [the] car accident." App., Vol. 3 at 101; *see also id.* at 105; App., Vol. 2 at 189. Mr. Shotts continued taking daily painkillers, and at a doctor's visit in 2014, he reported "[t]aking Ibuprofen 800MG[,] 1 tablet [t]hree times a day." App., Vol. 3 at 111.

In 2015, Mr. Shotts received treatment for digestive issues and ulcers. In June 2016, his physician sent a letter to his attorney, stating, "Brian Shotts is a patient under my care for multiple diagnoses. [He] has a history of long term use of 800mg [of nonsteroidal anti-inflammatory drugs] five to six times daily. Due to the length of use, [he] developed peptic ulcer disease. The peptic ulcer disease then led to further complications." App., Vol. 2 at 227.

### 4. Worker's Compensation and Farmers Claims

After the accident, Mr. Shotts filed a worker's compensation claim and a claim with Farmers, Ms. Pollard's insurer. In January 2016, Farmers paid $10,154.51 for the worker's compensation claim. It offered the rest of Ms. Pollard's policy limits—$14,845.49—to resolve any remaining claims.[8]

### 5. GEICO Claim

In March 2016, Mr. Shotts's attorney, Clifton Naifeh, informed GEICO of the accident. GEICO opened a claim and assigned the case to adjuster Larrisa Henley. Ms. Henley requested a copy of Mr. Shotts's policy declarations page and the police report. She asked Mr. Shotts to sign and return authorizations allowing GEICO to access his medical data. She also left a voice message with Farmers to request information about the claim.

Mr. Shotts submitted the police report, his medical bills, and relevant medical records to Ms. Henley. He also provided a recorded statement about the incident.

### 6. GEICO's Waiver of Subrogation Rights

GEICO next received a letter from Mr. Naifeh. In the letter, Mr. Naifeh explained that Farmers paid $10,154.51 for Mr. Shotts's worker's compensation claim and had

---

[8] It appears from the record that Mr. Shotts never accepted this offer. In one of his submissions to the district court, Mr. Shotts stated, "[GEICO's] position that [Mr. Shotts] may have prematurely or surreptitiously accepted Farmers [sic] partial policy limits, or later the full policy limits, at any time is not shown in the record anywhere prior to GEICO's evaluation [that] the claim exceeds the tortfeasors [sic] limits." App., Vol. 5 at 164.

offered the remaining policy limits as settlement. Mr. Naifeh stated this offer was insufficient because "Mr. Shotts suffered a significant injury well in excess of the adverse carriers [sic] policy limits." App., Vol. 5 at 128. He requested that GEICO "waive its subrogation interest, so that [Mr. Shotts] may accept the third-party tortfeasors [sic] offer" and "timely pay in good faith all policy benefits to which [Mr. Shotts] is entitled." *Id.* at 129. He included a copy of the Farmers offer, a summation of the medical bills Mr. Shotts attributed to the accident, and the medical records and bills supporting the summation.

After reviewing the letter, Ms. Henley made a note in Mr. Shotts's case file attributing fault to Ms. Pollard. She then contacted Mr. Naifeh to request access to Mr. Shotts's medical records. She also informed Mr. Naifeh that GEICO "waive[d] [its] subrogation interest so that Mr. Shotts may accept the tort feasor's [sic] offer." App., Vol. 2 at 147.

7. **GEICO's Investigation and Initial Evaluation**

Ms. Henley evaluated Mr. Shotts's claim using the medical documents Mr. Naifeh attached to his letter. She reviewed records from various medical facilities and providers, including the Comanche County Memorial Hospital, the Southwest Medical Center, the Oklahoma Spine Institute, and at least three physicians. She also reviewed Mr. Shotts's MRIs and other medical imaging. Based on her assessment, she concluded that Mr. Shotts sustained "thoracic strain and back pain." *Id.* at 191.

12

Ms. Henley then used Mr. Shotts's medical bills to determine the value of his claim. She excluded medical bills for visits to digestive health specialists because she concluded they were not related to the accident. She determined Mr. Shotts's claim had a value between $19,822.91 and $24,822.91.

When Ms. Henley completed her evaluation, she wrote to Mr. Naifeh. She explained, "We have confirmed that Farmers has Bodily Injury limits of $25,000. Based on the information you submitted in your demand, my evaluation . . . is within the tortfeasors [sic] limits. Therefore, I will not be extending any offer." App., Vol. 5 at 134. Mr. Naifeh responded with a letter stating that he did not agree with the evaluation because it was too low. The letter also demanded a first-dollar payment under *Burch*.[9]

8. **GEICO's Reevaluation and Additional Investigation**

After receiving Mr. Naifeh's letter, Ms. Henley reevaluated Mr. Shotts's claim. She did not change her general damages evaluation or alter her assessment of Mr. Shotts's injuries, but she adjusted her calculation to reflect incurred, rather than paid, medical expenses. Based on this reevaluation, Ms. Henley offered a settlement of $3,210.87.

Mr. Naifeh declined "the unreasonably low offer." App., Vol. 2 at 206. He requested that GEICO reevaluate the claim and, based on *Burch*, "pay the first dollar of

---

[9] As explained above, *Burch* held "that when the preconditions for the loss under [UM] coverage exist, [a UM] coverage carrier is obligated to pay the entire loss of its injured insured from the first dollar up to the policy limits." 977 P.2d at 1064.

[Mr. Shotts's] claim, up to the value of [the] claim or the total available UM limits." *Id.* at 205.

GEICO did not respond to Mr. Naifeh's requests. Shortly after, Mr. Naifeh informed Ms. Henley that Farmers had offered $25,000 to settle the claim. He also requested confirmation from GEICO that it had waived its subrogation rights. Ms. Henley responded, confirming that GEICO would "waive any subrogation rights to that policy." App., Vol. 5 at 148.

Over the next several weeks, Mr. Naifeh twice asked GEICO to reevaluate the $3,210.87 settlement offer. In response, Ms. Henley requested further information regarding Mr. Shotts's injuries and inquired about the ulcers he claimed he developed after the accident. Mr. Naifeh provided a doctor's letter and medical authorization for GEICO to obtain additional medical records. He stated the records he already produced clearly "provided that Mr. Shotts's [sic] peptic ulcer did not develop until after the subject collision," App., Vol. 3 at 190, and asked GEICO to pay "within 30 days" because "[i]t [was] well past time for GEICO to have paid," *id.* at 191.

Ms. Henley used the medical authorizations to request additional records. She told Mr. Naifeh that once she "received the requested documentation," she would "review to determine if a peer review . . . [was] needed to complete [the] evaluation." App., Vol. 2 at 248. She also wrote:

> The medical records you have provided in the past indicate
> that Mr. Shotts had prior chronic back pain issues and was
> already taking the medication that you indicate caused his
> Peptic Ulcer. In addition, the letter from [Mr. Shotts's

14

doctor] indicates that multiple diagnoses caused his ulcer, but it is unclear what diagnosis is or is not related to this loss. The peer review . . . will assist in providing me the information needed to determine if the ulcer was caused directly as a result of the treatment from this loss.

*Id.*

## C. *Procedural Background*

After learning that Ms. Henley intended to seek peer review of the claim, Mr. Shotts sued GEICO in Oklahoma state court, asserting claims for breach of contract and bad faith. Specifically, Mr. Shotts alleged that GEICO conducted "a biased and unfair investigation and evaluation of [his] claim," "unfairly failed and refused to pay any amount which it owed . . . under the UM/UIM coverages," and "breached its contract and its duties to [him]." App., Vol. 1 at 30-31.

Invoking diversity jurisdiction, GEICO timely removed to the United States District Court for the Western District of Oklahoma. It then moved for summary judgment. Mr. Shotts opposed the motion, arguing that GEICO acted in bad faith by (1) conducting an inadequate investigation and evaluation of his claims, (2) failing to timely pay the full policy limits as required under *Burch*, (3) requesting peer review, and (4) mishandling his requests about policy stacking.[10] The court initially denied the motion in part, but eventually granted summary judgment for GEICO on all claims.

_____

[10] Only the first and second bad faith claims are at issue on appeal.

15

In its initial ruling, the district court granted summary judgment on the inadequate investigation, peer review, and stacking bad faith claims. It also granted summary judgment for GEICO on the issue of punitive damages. But it concluded GEICO was "not entitled to summary judgment as to [Mr. Shotts's] bad faith claim premised on a violation of *Burch*" because GEICO "did not promptly tender 'first dollar' payment to [Mr. Shotts] after [Ms.] Henley determined the value of [the] claim exceeded the tortfeasor's policy limits." App., Vol. 5 at 104-05.

GEICO moved for reconsideration. The district court granted the motion and entered summary judgment for GEICO on the *Burch* bad faith claim. In doing so, the court noted that, although GEICO never paid the full value of Mr. Shotts's claim, it had waived its subrogation rights, which allowed Mr. Shotts to seek prompt payment from Farmers. It concluded that "summary judgment should be entered in GEICO's favor as to [Mr. Shotts's] bad faith claim premised on *Burch* and alleging that GEICO failed to make prompt payment of proceeds due under the policy." *Id.* at 208.

Mr. Shotts timely appealed the district court's summary judgment rulings on his unreasonable investigation bad faith claim, *Burch* bad faith claim, and punitive damages request. We affirm on all three.

## II. **DISCUSSION**

This appeal concerns whether the district court properly granted summary judgment for GEICO on Mr. Shotts's (1) unreasonable investigation bad faith claim, (2) *Burch* bad faith claim, and (3) request for punitive damages.

16

On the unreasonable investigation claim, we affirm because Mr. Shotts has not provided evidence to show that GEICO's investigation demonstrated bad faith. On the *Burch* claim, we affirm because GEICO's waiver of subrogation rights extinguished its duty to make a prompt first-dollar payment. The punitive damages issue is dependent on and derivative of Mr. Shotts's bad faith claims. Because those claims fail, we also affirm the district court's summary judgment on punitive damages.

## A. *Background Law*

### 1. Standard of Review

"We review the grant of summary judgment by the district court *de novo*, applying the same legal standard to the evidence in the record as did the district court." *Oulds v. Principal Mut. Life Ins. Co.*, 6 F.3d 1431, 1436 (10th Cir. 1993). In doing so, "[w]e view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party." *Teets v. Great-W. Life & Annuity Ins. Co.*, 921 F.3d 1200, 1211 (10th Cir. 2019). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

### 2. Oklahoma Bad Faith Insurance Claims

Under Oklahoma law, "[a]n insurer has an 'implied-in-law duty to act in good faith and deal fairly with the insured to ensure that the policy benefits are received.'" *Badillo v. Mid Century Ins. Co.*, 121 P.3d 1080, 1093 (Okla. 2005) (quoting *Christian v.*

*Am. Home Assurance Co.*, 577 P.2d 899, 901 (Okla. 1977)).  "[T]he violation of this duty gives rise to an action in tort . . . ."  *Christian*, 577 P.2d at 904.

"The core of a bad-faith claim 'is the insurer's unreasonable, bad-faith conduct, including the unjustified withholding of payment due under a policy.'"  *Flores v. Monumental Life Ins. Co.*, 620 F.3d 1248, 1255 (10th Cir. 2010) (quoting *McCorkle v. Great Atl. Ins. Co.*, 637 P.2d 583, 587 (Okla. 1981)).  To succeed on a bad faith claim, "the insured must present evidence from which a reasonable jury could conclude that the insurer did not have a reasonable good faith belief for withholding payment of the insured's claim."  *Oulds*, 6 F.3d at 1436 (citing *McCoy v. Okla. Farm Bureau Mut. Ins. Co.*, 841 P.2d 568, 572 (Okla. 1992)); *see also Garnett v. Gov't Emps. Ins. Co.*, 186 P.3d 935, 944 (Okla. 2008) ("A party prosecuting a claim of bad faith carries the burden of proof . . . ."); *Timberlake Constr. Co. v. U.S. Fid. & Guar. Co.*, 71 F.3d 335, 343 (10th Cir. 1995) ("[T]he insured must present sufficient evidence reasonably tending to show bad faith." (quotations omitted)).

To determine whether a plaintiff has made this showing, courts assess "whether the insurer had a good faith belief in some justifiable reason for the actions . . . that are claimed violative of the [insurer's] duty of good faith and fair dealing."  *Badillo*, 121 P.3d at 1093-94.  Courts make this determination "in light of all facts known or knowable concerning the claim at the time plaintiff requested the company to perform its contractual obligation."  *Oulds*, 6 F.3d at 1439 (quotations omitted).  "[U]ntil the facts . . . have established what might reasonably be perceived as tortious conduct on the

18

part of the insurer, the legal gate to submission of the issue to the jury remains closed." *Id.* at 1437.

Courts generally conduct this analysis in two steps. <u>First</u>, the court considers whether there is a legitimate dispute between the insurer and the insured regarding coverage or the value of the claim. If there is no legitimate dispute between the parties, the court may infer that the insurer denied payment in bad faith. *See Barnes v. Okla. Farm Bureau Mut. Ins. Co.*, 11 P.3d 162, 171, 175 (Okla. 2000) (finding no legitimate dispute about the amount or extent of coverage and concluding that insurer denied payment in bad faith). But where there *is* a legitimate dispute between the parties, then "as a matter of law[,] . . . no reasonable inference of bad faith arises." *Timberlake*, 71 F.3d at 344 (quoting *Oulds*, 6 F.3d at 1442).

Because "the denial of a claim based upon a legitimate dispute does not imply bad faith" as a matter of law, "judgment as a matter of law is to be granted to the insurer" unless the insured "produce[s] specific evidence of bad faith." *Oulds*, 6 F.3d at 1442. Thus, if the court determines there is a legitimate dispute between the parties, it proceeds to the <u>second</u> step of its analysis and considers whether the plaintiff offered specific additional evidence to demonstrate bad faith. *See Bannister v. State Farm Mut. Auto. Ins. Co.*, 692 F.3d 1117, 1128-32 (10th Cir. 2012) (identifying a legitimate dispute between the parties and then considering whether plaintiff had identified additional evidence of the insurer's bad faith). If the court determines that the plaintiff has offered sufficient

evidence to show the insurer acted in bad faith, the court will send the case to a jury. *Id.* at 1128; *see also Oulds*, 6 F.3d at 1442.

The additional evidence required for this showing may take several forms. For example, a plaintiff may demonstrate bad faith by providing "evidence that the insurer did not *actually* rely on th[e] legitimate [dispute]" to deny coverage, *Bannister*, 692 F.3d at 1128, "denied the claim for an illegitimate reason," *id.*, or otherwise "failed to treat the insured fairly," *Thompson v. Shelter Mut. Ins.*, 875 F.2d 1460, 1462 (10th Cir. 1989). A plaintiff may also show bad faith by providing evidence that the insurer performed an inadequate investigation of the claim. *See, e.g.*, *Oulds*, 6 F.3d at 1442.

B. ***Mr. Shotts's Bad Faith Claims***

Mr. Shotts alleges that GEICO demonstrated bad faith by (1) conducting an inadequate investigation, and (2) failing to pay the full, first-dollar value of his claim as required under *Burch*. We provide additional legal background and analysis relating to these claims.

Our analysis follows the two-step framework described above. We first consider whether there was a legitimate dispute between the parties regarding the value of Mr. Shotts's claim and the extent of his injuries. We hold there was a legitimate dispute. We therefore cannot conclude as a matter of law that GEICO breached the duty of good faith by refusing to pay the full value of Mr. Shotts's claim.

We thus proceed to consider whether Mr. Shotts has offered sufficient additional evidence to support his unreasonable investigation and *Burch* bad faith claims. As to

20

both, we hold that Mr. Shotts has not presented evidence to show GEICO acted in bad faith. We therefore affirm the district court's summary judgment for GEICO on both bad faith claims.

## 1. **Legitimate Dispute**

### a. *Legal background*

In Oklahoma, "a claim must be promptly paid unless the insurer has a reasonable belief the claim is either legally or factually insufficient." *Barnes*, 11 P.3d at 171. If there is no "legitimate dispute" between the parties regarding the amount or extent of coverage, then an insurer's denial of payment gives rise to an inference of bad faith as a matter of law. *See id.*; *see also id.* at 175. But where there is "a legitimate dispute," then "[n]o reasonable inference of bad faith arises." *Oulds*, 6 F.3d 1440. In such instances, courts will not conclude "as a matter of law" that the insurer "breach[ed] the duty of good faith *merely* by refusing to pay [the] claim." *Timberlake*, 71 F.3d at 344. Instead, courts will grant judgment for the insurer unless the insured can offer additional evidence of bad faith. *See Oulds*, 6 F.3d at 1442.

"[T]he fact that a reasonable jury could find in favor of the insurer based on all facts known or that should have been known by the insurer when it denied a claim is strong evidence that a dispute is 'legitimate.'" *Id.*

### b. *Analysis*

This case presents a legitimate dispute. Although GEICO and Mr. Shotts have access to the same sets of medical records, the parties disagree about the nature and

21

extent of his injuries. Mr. Shotts claims he had a normal spine before the accident and insists that his peptic ulcer developed only after the crash. GEICO, by contrast, maintains that Mr. Shotts's spinal problems predate the accident and that he "was already taking the medication that . . . caused his Peptic Ulcer." App., Vol. 2 at 248.

The record contains evidence from which "a reasonable jury could find in favor of the insurer." *Oulds*, 6 F.3d at 1442. Specifically, a reasonable jury could conclude from Mr. Shotts's medical records that his preexisting back injuries generated at least some of his post-accident medical expenses. The jury could also find that Mr. Shotts overestimates the value of his claim because some of his expenses were not necessitated by the accident. This is "strong evidence that a dispute is 'legitimate.'" *Id.*

Because the medical records in this case could support a finding that Mr. Shotts's back problems and peptic ulcer predated or are unrelated to the accident, there is a legitimate dispute between the parties. Accordingly, we cannot conclude as a matter of law that GEICO breached the duty of good faith by refusing to pay Mr. Shotts's requested claim. *See Bannister*, 692 F.3d at 1127-28.

2. **Additional Evidence of Bad Faith**

Because there is a legitimate dispute regarding the value of his claim, Mr. Shotts must "produce additional evidence of bad faith in order to send the issue to the jury." *Timberlake*, 71 F.3d at 344. Mr. Shotts attempts to make this showing by arguing that GEICO (a) conducted an inadequate investigation, and (b) failed to make timely first-dollar payment as required under *Burch*. We address these arguments in turn.

22

a. *Inadequate investigation*

i. Legal background

"[A] duty to *timely* and *properly* investigate an insurance claim is intrinsic to an insurer's contractual duty to *timely* pay a valid claim." *Brown v. Patel*, 157 P.3d 117, 122 (Okla. 2007); *see also Buzzard*, 824 P.2d at 1109 ("[T]he insurer must conduct an investigation reasonably appropriate under the circumstances."). Thus, even if there is a legitimate coverage dispute between the parties, an insurer's failure to conduct a reasonable investigation may give rise to a bad faith claim. *See Buzzard*, 824 P.2d at 1109; *see also Bannister*, 692 F.3d at 1128 ("[T]he jury may decide the issue . . . if there is evidence that the insurer failed to adequately investigate [the] claim." (quotations omitted) (alterations in original)); *Oulds*, 6 F.3d at 1442 ("The investigation of a claim may in some circumstances permit one to reasonably conclude that the insurer has acted in bad faith.").

"Under Oklahoma law, . . . an insurer's investigation need only be reasonable, not perfect." *Roberts v. State Farm Mut. Auto. Ins. Co.*, 61 F. App'x 587, 592 (10th Cir. 2003) (unpublished) (citing *Buzzard*, 824 P.2d at 1109).[11] Accordingly, "'when a bad faith claim is premised on inadequate investigation, the [claimant] must make a showing that material facts were overlooked or that a more thorough investigation would have

---

[11] Although not precedential, we find the reasoning in the unpublished opinions we cite to be instructive. *See* 10th Cir. R. 32.1 ("Unpublished decisions are not precedential, but may be cited for their persuasive value."); *see also* Fed. R. App. P. 32.1.

produced relevant information' that would have delegitimized the insurer's dispute of the claim." *Bannister*, 692 F.3d at 1128 (quoting *Timberlake*, 71 F.3d at 345). "[E]vidence of inadequate investigation must 'suggest a sham defense or an intentional disregard of uncontrovertible facts' in order to be put to a jury." *Id.*; *see also Oulds*, 6 F.3d at 1442.

### ii. Analysis

Summary judgment is inappropriate "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To return a verdict in favor of Mr. Shotts, a jury would have to determine that GEICO's investigation was not reasonable. Mr. Shotts has not provided evidence from which a reasonable jury could draw that conclusion.

The record shows that GEICO began its investigation immediately after it learned about the accident. It took a recorded statement from Mr. Shotts. It also requested Mr. Shotts's medical records and reviewed all the documents—including the MRIs and other medical images—he provided. GEICO continued this investigation after making its initial settlement offer, and it conducted additional review at Mr. Shotts's request. When Mr. Shotts objected to the initial offer, for example, GEICO reevaluated the claim and adjusted the offer to reflect incurred, rather than paid, medical expenses. And when he insisted that his ulcer developed after the accident, GEICO requested additional medical documentation and pursued peer review. Based on these facts, a reasonable jury could not conclude that GEICO's investigation was unreasonable.

24

Despite this, Mr. Shotts argued at summary judgment that "GEICO biasedly refused to consider and evaluate all of [his] permanent lifetime injuries"; "intentionally placed an unreasonably low dollar evaluation" on the claim; and "unfairly looked for ways to reduce, delay[,] or deny [his] claim." App., Vol. 3 at 45. But he did not offer specific evidence to support these bare allegations. For example, although Mr. Shotts alleged that Ms. Henley used a biased computer tool to conduct her evaluation, he provided no evidence to show the computer system was faulty or that the valuation was arbitrary.

Mr. Shotts also stated that Ms. Henley's "[f]ailure to properly consider important favorable information to the insured . . . is bad faith," but he did not explain when or how Ms. Henley overlooked information that might have been favorable to his claim. *Id.* at 47. He asserted that Ms. Henley ignored his worker's compensation records, which "would [have] suggest[ed] an injury more significant than a strain," *id.* at 40, but he did not explain how those records would have contradicted the other medical records Ms. Henley reviewed or "changed the underlying *facts* already known to [her]," *Timberlake*, 71 F.3d at 345. Finally, he argued that Ms. Henley "should have . . . investigated and evaluated" facts "such as the difference between the before and after MRI's [sic] and X-rays, the permanence of the injuries, [and] the value of the lifelong additional pain," but he did not provide evidence to show that Ms. Henley did not do this during her investigation. App., Vol. 3 at 48.

25

"Under Oklahoma law, . . . an insurer's investigation need only be reasonable, not perfect." *Roberts*, 61 F. App'x at 592. The undisputed facts indicate that GEICO conducted a thorough, timely, and reasonable review of the claim. Mr. Shotts has not shown "that material facts were overlooked or that a more thorough investigation would have produced relevant information that would have delegitimized the insurer's dispute of the claim," *Bannister*, 692 F.3d at 1128 (quotations omitted), and he has not "produce[d] additional evidence of bad faith," *Timberlake*, 71 F.3d at 344. A reasonable jury could not conclude that GEICO's investigation was unreasonable. Summary judgment was appropriate, and we affirm.

    b. *Burch first-dollar payment*

        i. <u>Legal background</u>

As explained above, Oklahoma UM insurers "may not delay the payment of benefits until exhaustion of [the other driver's policy] liability limits" and must make "prompt payment" on any claim that "exceeds the liability limits [of the underinsured at-fault driver]." *Buzzard*, 824 P.2d at 1112. *Burch* clarified that this prompt-payment requirement applies to the "entire amount of [the claim] from the first dollar up to the UM policy limits." 977 P.2d at 1058. Thus, if an individual is injured by an underinsured motorist, and if the individual's injuries exceed the underinsured motorist's policy limits, the UM insurer must promptly pay the full value of the UM claim.

Oklahoma case law recognizes a connection between the prompt-payment requirement and a UM insurer's subrogation rights. For example, Oklahoma courts have

26

specified the prompt-payment requirement does not apply if an insured party

intentionally interferes with or destroys a UM insurer's subrogation rights. *See Porter v.*

*MFA Mut. Ins. Co.*, 643 P.2d 302, 305 (Okla. 1982); *Torres v. Kan. City Fire & Marine*

*Ins. Co.*, 849 P.2d 407, 413 (Okla. 1993).[12]  And when the Oklahoma Supreme Court

specified in *Burch* that the prompt-payment requirement applies "from the first dollar up

to the policy limits," 977 P.2d at 1064, it emphasized that, although the UM insurer was

obligated to pay the full amount of the plaintiff's claim, the insurer could still "proceed in

its own right against the tortfeasor," *id.* at 1065.  The *Burch* court also observed that it

might be unfair to require the UM insurer to "duplicate" coverage, but it concluded this

would not happen when the UM insurer could obtain payment through subrogation. *Id.*

It emphasized that its holding "[did] not make the UM carrier the final indemnitor"

because "[t]*he UM carrier is statutorily subrogated* to the rights of its insured against the

[underinsured at-fault driver]." *Id.*  Put differently, *Burch* used the UM insurer's ability

---

[12] Oklahoma courts refer to this as the "*Porter* doctrine" or "*Porter* defense."  It is not absolute.  An insured party's interference with a UM insurer's subrogation rights does not always extinguish the insurer's duty to render prompt payment.  Rather, "equitable considerations come into play when a UM carrier seeks to avoid payment of a claim based on allegations that the insured has prejudiced its subrogation rights." *Strong v. Hanover Ins. Co.*, 106 P.3d 604, 610 (Okla. Civ. App.); *see, e.g.*, *McFadden v. Arch Ins. Co.*, 2013 WL 105214, at *3 (E.D. Okla. Jan. 8, 2013) (unpublished) (insured's release of claims against underinsured at-fault driver did not extinguish UM insurer's prompt-payment duties because insured did not know he had UM coverage and "did not *voluntarily and knowingly* interfere with [the UM insurer's] right to subrogation" (emphasis added)); *Buzzard*, 824 P.2d at 1114 (insured's release of claims against at-fault driver did not extinguish UM insurer's prompt-payment duties because "[the UM insurer's] course of action forced [the insured] to negotiate with the [underinsured at-fault driver's] insurer").

to "seek recovery of paid indemnity through an exercise of its right to subrogation" as justification for the first-dollar payment requirement. *Id.*

ii. Analysis

Mr. Shotts has not demonstrated that GEICO acted in bad faith when it failed to make a prompt first-dollar payment. Although "being legally able to exercise subrogation rights is not the *sine qua non* of an obligation to pay a [UM] claim," *Phillips*, 263 F.3d at 1222, the principles articulated in Oklahoma case law suggest that a UM insurer's duty to render prompt payment is linked to its ability to exercise subrogation rights.[13] *Burch*, in particular, indicates that courts crafted the first-dollar payment requirement with an insurer's subrogation rights in mind. Here, GEICO waived its subrogation rights. In doing so, it relinquished its ability "to proceed in its own right against the tortfeasor." *Burch*, 977 P.2d at 1065. Under these circumstances, requiring first-dollar payment would force GEICO to make a payment that it could not later recoup

---

[13] In a few cases, Oklahoma courts have suggested that a "[UM] carrier's legal ability to exercise subrogation rights is not an indispensable condition of its obligation to pay an otherwise valid [UM] claim." *Strong*, 106 P.3d at 610; *see also Torres*, 849 P.2d at 413; *Robertson v. U.S. Fid. & Guar. Co.*, 836 P.2d 1294, 1297 (Okla. 1992); *Barfield v. Barfield*, 742 P.2d 1107, 1112 (Okla. 1987); *Uptegraft*, 662 P.2d at 686-87. In each of these cases, the UM insurer attempted to avoid its payment obligations by arguing that the insured had somehow interfered with its subrogation rights. And in each case, the court held that the insurer could not assert a *Porter* defense because the insurer had itself provoked or otherwise contributed to the insured's conduct. The cases thus stand for the limited proposition that an insured's interference with a UM insurer's subrogation rights will not always extinguish the UM insurer's prompt-payment duties. But they do not suggest that subrogation rights are irrelevant to the prompt-payment requirement and do not affect our analysis above.

from Farmers. This would, in essence, make GEICO "the final indemnitor for the injured party's loss"—an outcome the *Burch* court sought to avoid. *Id.* We thus conclude that GEICO's waiver of subrogation rights extinguished its duty to render a prompt, first-dollar payment.

Policy considerations support this conclusion. Requiring prompt first-dollar payment when a UM insurer has waived its subrogation rights would enable injured parties to obtain double recovery. Specifically, an injured party could (1) obtain a settlement offer from the underinsured motorist's insurer, (2) request that the UM insurer waive its subrogation rights, (3) request and accept a first-dollar payment from the UM insurer, and then (4) accept the underinsured driver's settlement offer. This would allow the injured party to recover from both the UM insurer and the underinsured driver's insurer. But because the UM insurer would have waived its subrogation rights, it would not be able to recoup its payment from the underinsured driver's insurer. The UM insurer's payment would thus "create a duplicate pool of insurance," *Burch*, 977 P.2d at 1065, and would allow the injured party to receive payments from two insurers that could not later seek reimbursement from one another. The UM carrier's payment also would not operate as "a temporary expedient to facilitate prompt payment to the insured," *Burch*, 977 P.2d at 1065, but would instead be a final and unrecoverable payment to the injured party.

Because GEICO waived its subrogation rights, requiring GEICO to render prompt, first-dollar payment would allow Mr. Shotts to recover twice for his injuries: once from

29

GEICO, and once from Farmers. We decline to permit that outcome. Instead, we hold that GEICO's waiver extinguished its duty to promptly pay the full value of Mr. Shotts's claim. Mr. Shotts thus cannot show that GEICO's failure to pay constituted bad faith. Summary judgment on the *Burch* claim was appropriate, and we affirm.

## C. *Punitive Damages*

As stated earlier, Mr. Shotts's punitive damages claim is derivative of and dependent on his bad faith claims. Because both of those claims fail, his request for punitive damages must fail, too. We affirm the district court's summary judgment for GEICO on Mr. Shotts's request for punitive damages.

## III. **CONCLUSION**

We affirm the district court's summary judgment for GEICO on Mr. Shotts's bad faith and punitive damages claims.[14]

---

[14] We grant Mr. Shotts's February 22, 2019 motion to file the appendix to his opening brief under seal. We deny his March 1, 2019 motion to unseal the same.